REPPLIER COAL CO. v. COMMISSIONER OF INTERNAL REVENUE.

COMMISSIONER OF INTERNAL REVENUE v. REPPLIER COAL CO.

Nos. 8398, 8397.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 4, 1944.

Decided Feb. 19, 1944.

Roy G. Peterson, of New York City (Truman Henson, of New York City, on the brief), for Repplier Coal Co.

Joseph M. Jones, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to the Atty. Gen., on the brief), for the Commissioner.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

The taxpayer and the Commissioner are in dispute concerning certain items of the taxpayer's income tax for the years 1935 and 1936. From the Tax Court's decision, the taxpayer brings two questions to this Court upon petition for review; the Commissioner brings one. The two petitions were heard together and will be treated in one opinion. The taxpayer's objections will be considered first.

I.

The taxpayer is in the business of mining and selling coal. In 1936 it constructed a certain mine tunnel at a cost of $86,394.-03. It thus made available for production 394,000 tons of coal, of which it produced and sold some 5,000 tons in 1936. The mine had passed its development stage sometime before 1936. On its tax return, the taxpayer sought to deduct as a deferred operating expense a proportionate part of the cost of the tunnel. The Commissioner treated the cost as a capital expenditure, recoverable only through depletion. The Tax Court found that the expenditure was of a capital nature, and sustained the Commissioner. The taxpayer asks us to reverse the Tax Court on this, and to hold that the cost of the tunnel is deductible in full for 1936 as an ordinary and necessary expense of operation, a position apparently not urged before the Tax Court.

The Revenue Act of 1936 allows a deduction in computing net income of mines, of a reasonable allowance for depletion.[1] The allowance is to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. The regulations [2] promulgated pursuant to this section require expendi-

---

[1] § 23(m), 26 U.S.C.A. Int.Rev.Acts, page 829.

[2] U. S. Treas. Reg. 94, Art. 23(m-15): "Art. 23(m)-15. Allowable capital additions in case of mines.—(a) All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining.

(b) Expenditures for plant and equipment and for replacements, not including expenditures for maintenance and for ordinary and necessary repairs, shall ordinarily be charged to capital account recoverable through depreciation. Expenditures for equipment (including its installation and housing) and for replacements thereof, which are necessary to maintain the normal output solely because of the recession of the working faces of the mine, and which (1) do not increase the value of the mine, or (2) do not decrease the cost of production of mineral units, or (3) do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made, shall be deducted as ordinary and necessary business expenses."

tures in excess of net receipts to be charged to capital account recoverable through depletion while the mine is in the development stage.' The mine in question was past the development stage. The regulations further provide that expenditures for equipment and replacements thereof, necessary to maintain the normal output solely because of recession of the working faces of the mine and which meet certain other requirements shall be deducted as ordinary and necessary business expenses.

The taxpayer contends that its mine having passed the development stage and having attained an established output, the tunnel construction was only to maintain that output. It offered figures to support this argument and urges that under the regulations the expenditure is to be treated as an ordinary and necessary expense.

We think it clear that the taxpayer's argument at this stage of the litigation is sapped of whatever strength it once might have had, by the recent decision of the Supreme Court in Dobson v. Commissioner of Internal Revenue, 1943, 64 S.Ct. 239. The Tax Court found that the expenditure was of a capital nature. The section of the statute providing for depletion does not specify what expenditures are to be capitalized. The regulations (quoted above), while setting up rules in this respect, do not, as the taxpayer urges, say that all expenditures after the development stage are to be treated as ordinary and necessary expenses. Certain kinds of expenditures are to be so treated. On the other hand, specified expenditures after the development stage, are ordinarily to be charged to the capital account. We find nothing said in the statute or regulations which conflicts with the Tax Court's conclusion that the tunnel expenditure was of a capital nature.

▌ The taxpayer has referred us to numerous accounting authorities for support of its contention. However, in so far as the problem at hand involves rules of accounting, the determination of the appropriate rule of accounting is a matter solely within the Tax Court's competence under the Dobson decision. The amount of 'he expenditure, the nature of the improvement, its effect on the value of the mine, these and others, are factors for the Tax Court to weigh in determining the accounting rule to be applied. Under the statute and regulations, although a mine has passed the development stage, an ex-

penditure which is of a capital nature is to be treated as such. And, there certainly was sufficient evidence to justify the Tax Court's treatment of the expenditure as a capital item. Since this conclusion of the Tax Court is precluded by neither the statute nor the regulations, it must be accorded by us the finality to which it is entitled under the Dobson decision. Upon this point, the decision of the Tax Court is affirmed.

## II.

The taxpayer's second point has to do with the determination of the net income from its mining property for percentage depletion purposes. Under the contract with the miners' union the taxpayer was required to furnish its miners dynamite and miners' supplies, and to rent them mine lamps, at fixed charges to be deducted from wages payable. The taxpayer made a profit on these items of $10,156.25 in 1935 and $9,203.84 in 1936.

The taxpayer elected to deduct depletion on the percentage basis in 1935 and 1936. For the purposes of computing its depletion deduction, the company included in its gross income the profits it made on the items furnished the miners under the contract. The Commissioner excluded these profits and, in computing the net income from the property, he deducted from gross income the full amount of wages to which the miners were entitled under their contract, without deduction therefrom of charges made for supplies sold or rented or profit on these items. Under the Commissioner's treatment, the depletion deduction of 50% 'of net income was decreased, since the net income decreased. The Tax Court sustained the Commissioner.

The taxpayer does not directly contend that the profits on the items it supplied to the miners should be included in the income from the property. It argues, however, that in computing the net income from the property, the actual amount of money paid the miners, plus the cost to the taxpayer of the items supplied, should be deducted from gross income, not the full amount to which the miners were entitled as wages before deductions were made. The former it says really represents its cost in producing the coal. The Tax Court, in rejecting this contention found that the taxpayer was obligated to pay its employees a fixed amount, a fact not disputed by the taxpayer. It concluded that the essential nature of the situation was

the same as if the wages had been paid in full and a profit realized upon a distinct and separate transaction through a sale of supplies to the miners.

█ The conclusion of the Tax Court upon this point must be affirmed. Under the statute and regulations the depletion deduction allowed is computed on the basis of gross and net income from the property. Neither gives a rule so definitive as expressly to answer the present question.[3] The method of paying the miners could be regarded as one transaction or two separate ones in arriving at taxpayer's net income from the property. The choice was for the Tax Court to make and not this Court. Dobson v. Commissioner of Internal Revenue, supra. The decision of the Tax Court is affirmed on this point.

### III.

██ The third problem is brought to us on petition by the Commissioner. It concerns depreciation. In 1922 the taxpayer acquired a coal lease which was to expire in 1934. The taxpayer in 1926 constructed upon the land included in this lease a plant at a cost of $912,336.11 and a railroad siding at a cost of $12,139.91. A reasonable allowance for exhaustion, wear and tear of the plant and railroad siding during the years 1930 to 1934 was five per centum of their respective costs. In 1930 the unrecovered cost of both was $663,866.42. The taxpayer had no assurance that the lease would be renewed or extended when it expired, the plant having been

originally constructed without consideration of renewal. The taxpayer during the years 1930–1934, inclusive, claimed depreciation deductions based upon the remaining life of the lease. Thus by the end of 1934, it had claimed as deductions the full amount of the cost basis.

In 1934, a new lease on a month to month basis was granted taxpayer. This lease had not been terminated at the time of the hearing before the Tax Court. The taxpayer claimed depreciation deductions on its plant of $99,108.10 for 1935 and $31,204.25 for 1936. The Commissioner disallowed these deductions on the ground that the assets had been fully depreciated by allowed or allowable deductions claimed in prior years.

The Tax Court found that the depreciation deductions for the years 1930 to 1934 did not offset taxable income in full in each of the years. It therefore held that the rule of Pittsburgh Brewing Co. v. Commissioner of Internal Revenue, 3 Cir., 1939, 107 F.2d 155, decided by this Court,[4] was controlling and to the extent that deductions did not offset taxable income, depreciation had not been "allowed" within the meaning of the statute.

The statutes provide that the basis upon which depreciation shall be allowed is the cost of the property with proper adjustment for depreciation "to the extent allowed (but not less than the amount allowable) under this Act or prior income tax laws."[5] Our decision in the Pittsburgh

---

3 § 114(b) of the Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev.Acts, pp. 702, 867 provides:

"(4) Percentage depletion for coal and metal mines and sulphur. The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum, * * * of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property. * * *"

Art. 23(m)-1 of U. S. Treas. Reg. 86 and 94 provides:

"(g) 'Gross income from the property' as used in section 114(b) (3) and (4) and articles 23(m)-1 to 23(m)-28, inclusive, means the amount for which the taxpayer sells (a) the crude mineral product of the property or (b) the product derived therefrom, * * *."

"(h) 'Net income of the taxpayer (computed without allowance for depletion) from the property,' as used in section 114 (b) (2), (3), (4) * * * means the 'gross income from the property' as defined in paragraph (g) less the allowable deductions attributable to the mineral property upon which the depletion is claimed and the allowable deductions attributable to the processes listed in paragraph (g) in so far as they relate to the product of such property, including overhead and operating expenses, development costs properly charged to expense, depreciation, taxes, losses sustained, etc., but excluding any allowance for depletion. * * *"

4 The Tax Court's decision was prior to the decision of the Supreme Court in the Virginian Hotel Corporation case, infra.

5 § 113(b) (1) (B) of the Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev.Acts, pages 700 and 865, made applicable by §§ 23(n), 114(a) and 113(a).

558

Brewing Co. case, was in effect overruled by the Supreme Court in Virginian Hotel Corporation v. Helvering, 1943, 319 U.S. 523, 63 S.Ct. 1260, 87 L.Ed. 1561.[6] It was there held that, in readjusting the depreciation basis of the Hotel, excessive depreciation claimed in prior years was properly deducted from cost although no tax benefit had resulted to the taxpayer from the deductions for depreciation. The Court thus rejected the contention that deductions taken by the taxpayer and not disallowed by the Commissioner are not "allowed" within the meaning of the statute to the extent they do not result in a tax benefit. This was contrary to the construction we had attributed to "allowed" in the Pittsburgh Brewing Co. decision and which was followed by the Tax Court in this case.

No question of fact is here involved; the point is the legal effect to be given to the term "allowed" as used in the statute. See Commissioner of Internal Revenue v. Heininger, 1943, 64 S.Ct. 249. Upon this, both the Tax Court and we must, of course, follow the meaning given the term by ultimate authority. The decision of the Tax Court upon this point is, therefore, reversed and remanded.

The decision of the Tax Court is affirmed upon the taxpayer's petition; reversed and remanded upon the Commissioner's petition.

---

6 Certiorari was granted because of conflict between the decision of the Fourth Circuit and our decision in the Pittsburgh Brewing Co. case.