United States Court of Appeals,

Fifth Circuit.

No. 92-3482.

Bertha Paglin FERMAN, etc., Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

June 18, 1993.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before KING and EMILIO M. GARZA, Circuit Judges, and HALL,* District Judge.

KING, Circuit Judge:

Bertha Paglin Ferman, acting in her capacity as executrix of the estate of Jules J. Paglin, brought this action against the United States to obtain a refund of $117,362.03 in federal estate taxes, plus interest and costs. Ferman asserts that an amendment to the Internal Revenue Code, which retroactively restricted the availability of an estate tax deduction for the sale of employer securities to an employee stock ownership plan, violates due process as applied to Paglin's estate. The parties filed cross-motions for summary judgment before the district court, which granted summary judgment in favor of the government. Ferman appeals from that judgment. Finding that, in the context of the facts before us, the retroactive amendment to the deduction at issue does not constitute a violation of due process, we affirm the district court's grant of summary judgment in favor of the government.

## I. BACKGROUND

The facts in the case before us are not in dispute, and they have been presented by the court below. *See Ferman v. United States,* 790 F.Supp. 656 (E.D.La.1992). Following is a brief discussion of (a) section 2057 of Title 26 and its amendment, (b) the facts relevant to this appeal, and (c) the proceedings below.

**A.** *Section 2057*

The Tax Reform Act of 1986, Pub.L. No. 99-514, 100 Stat. 2085 (the Act), was enacted on

_____

*District Judge of the Eastern District of Texas, sitting by designation.

October 22, 1986. Section 1172(a) of the Act added section 2057 to the Internal Revenue Code, which allowed estates a deduction for fifty percent of the "qualified proceeds" of a "qualified sale" of any employer securities to an employee stock ownership plan (ESOP). *See* 26 U.S.C. § 2057. The term "qualified sale" was defined as "any sale of employer securities by the executor of an estate to ... an employee stock ownership plan ... described in section 4975(e)(7)." 26 U.S.C. § 2057(b)(1). "Qualified proceeds" was defined as "the amount received by the estate from the sale of employer securities at any time before the date on which the return of the tax imposed by section 2001 is required to be filed." 26 U.S.C. § 2057(c)(1). Under section 1172(c) of the Act, section 2057 was made applicable to sales by executors required to file estate tax returns after the date of its enactment. As discussed below, section 2057 made it possible for the executor of an estate to purchase stock from a company and then resell that stock to the company's ESOP—usually at a discount so as to provide an incentive for the ESOP to participate in the transaction—in order to receive a fifty percent deduction on the proceeds of that sale.

On January 5, 1987, the Internal Revenue Service (IRS) issued a news release addressing a number of statutory changes affecting employee plans. This notice was formally published on January 25, 1987 as Notice 87-13, 1987-1 C.B. 432 (Notice 87-13). "Question-and-answer 23" of Notice 87-13 indicated that, "[p]ending the enactment of clarifying legislation," the IRS would not recognize the deduction permitted under section 2057 unless (1) the decedent directly owned securities *before death* and (2) the securities were allocated or held for future allocation by the plan in specified ways. *Id.* at 442.

On February 26, 1987, proposed legislation concerning the scope of section 2057's deduction was introduced into Congress. The bill's sponsors stated that it "would confirm the positions taken in IRS Notice 87-13" and that, "[b]ecause these provisions accurately reflect Congressional intent in enacting the pro vision, this clarification would be effective as if included in the [1986 Act]." 133 CONG.REC. H845 (daily ed. Feb. 27, 1987); 133 CONG.REC. S2532 (daily ed. Feb. 27, 1987). This proposal made its way into the Omnibus Reconciliation Act of 1987, Pub.L. No. 100-185, 101 Stat. 1330 (the 1987 Act), which was enacted into law on December 22, 1987. Section 10411 of this Act

amended section 2057 of the Internal Revenue Code to impose the additional requirements identified in Notice 87-13, effective as if the pro vision had been contained in the 1986 Act.[1]  The legislative history behind the enactment of the 1987 Act states, in pertinent part,

> [i]n enacting the estate tax deduction[,] Congress intended that it would be utilized in a limited number of transactions with a relatively modest revenue loss.  As drafted, the estate tax deduction was significantly broader than what was originally contemplated by Congress in enacting the provision.  The committee believes it is necessary to conform the statute to the original intent of Congress in order to prevent a significant revenue loss under the Tax Reform Act of 1986.
>
> While Congress intended to encourage transfers of employer securities to ESOPs by providing for partial elimination of estate tax liability, it was not intended that estates be able to eliminate all estate tax liability through use of the deduction[,] or that the securities acquired in a transaction for which the deduction was claimed need not be allocated to plan participants.  The provision would not have been adopted in its present form had the full extent of the revenue impact and the effect of the provision been recognized.
>
> The committee concludes that it is now necessary to modify the provision to bring the revenue loss in line with the original estimate and congressional intent.  The modifications contained in the bill are designed to achieve this result while maintaining to the fullest extent possible the incentive to transfer employer securities to ESOPs.
>
> The primary thrust of the bill is to conform the provision to the original intent of Congress in enacting the deduction.  In this respect, the bill has two elements.
>
> First, the bill makes clear that the positions taken by the Internal Revenue Service in Notice 87-13 with respect to the estate tax deduction are an accurate statement of Congressional intent in enacting the provision.  If these clarifications are not made, taxpayers could qualify for the deduction by engaging in essentially sham transactions.
>
> Second, the bill makes additional changes in the deduction which more fully effectuate the intent of Congress to provide limited relief for the estate tax.

H.R.Rep. No. 100-391(II), 100th Cong., 1st Sess. 1045 (1987), *codified at* 4 U.S.C.C.A.N. 2313-1, 2313-661 (1987);  *see also* H.R.Conf.Rep. No. 100-495, 100th Cong., 1st Sess. at 998 (1987), *codified at* 4 U.S.C.C.A.N. 2313-1245, 2313-1744 (1987) (adopting the House version of the bill).

**B.** *The Paglin Estate's Reliance on the Unamended Version of Section 2057*

Bertha Paglin Ferman is the testamentary executrix of the estate of her father, Jules J. Paglin (decedent).  At the time of his death on October 27, 1986, the decedent owned stock in over 75

---

[1]Although not important for the purposes of resolving the case before us, we note that section 2057 was subsequently repealed for the estates of persons dying after July 12, 1989. *See* Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101-239, 103 Stat. 2106, 2352-2354, § 7304(a).

publicly traded corporations, including 100 shares of ALZA Corporation stock valued at $2,031.25; the decedent had no legal relationship with the ALZA ESOP at the time of his death.

From February 20 to February 24, 1987, decedent's estate entered into three series of transactions in which it purchased shares of ALZA Corporation stock, and then sold those shares to the ALZA Corporation ESOP: (1) on February 20, the estate purchased 12,300 shares of stock at a total cost of $348,960, which it sold to the ESOP that same day for $329,175; (2) on February 23, the estate purchased 112,200 shares of ALZA stock for $329,090, which it sold to the ESOP that same day for $310,317.50; and (3) on February 24, the estate purchased 11,200 shares of ALZA Corporation common stock for $310,100, which it sold to the ESOP that day for $292,600.[2] The parties have stipulated that the $7,000 brokerage commission paid by the estate when originally purchasing the stock and the stock value discounts given to the ESOP resulted in a total loss to the estate of $49,057.50.[3]

Ferman entered these transactions on the advice of her attorneys in order to realize a tax deduction under section 2057, and the parties have stipulated that her "decision to purchase these shares of ALZA stock, pay the commissions due on the purchases, and resell the stock to the ALZA ESOP at a discount, was purely tax motivated." The parties have also stipulated that

> [t]he only reason that the estate purchased ALZA stock, as opposed to the stock of another company, was the fact that the ALZA ESOP had by prior agreement agreed to purchase at a discount the entire quantity of ALZA Corporation stock directly from the estate, and the ALZA ESOP agreed to make the purchase from the estate over the three-day period.

Ferman also chose the ALZA ESOP because it agreed to purchase the shares at a lower discount than the other ESOPs she contacted.

On December 15, 1987, the estate filed a claim with the IRS for a refund on its federal estate taxes in the amount of $177,362.03, plus interest. According to the estate, it was entitled to a deduction under section 2057 in the amount of $466,046.25, or one-half of the $932,092.50 total

---

[2]These stock purchase prices include brokerage commissions paid by the estate and, therefore, they do not reflect the actual market value of the stock.

[3]The record does not disclose whether the estate in any way claimed this loss as a tax deduction.

proceeds received from its sales of ALZA Corporation stock to the ALZA ESOP. This deduction reduced the decedent's taxable estate from $1,869,839.03 to $1,403,792.78, and the estate's tax liability from $511,097.55 to $333,735.52, for a total savings of $177,362.03. The IRS denied the estate's refund claim on January 31, 1990.

## C. *Proceedings*

Soon after the IRS denied the estate's refund, Ferman instituted this action contending that (1) the estate is entitled to the ESOP sales deduction because it fully complied with the plain meaning of section 2057 as it existed at the time the sales were consummated, and (2) retroactive application of the 1987 Act to the estate's circumstances violates the Due Process Clause of the Fifth Amendment. Ferman moved for summary judgment, and the IRS filed a cross-motion for summary judgment, contending that the government's retroactive amendment to section 2057 does not constitute a violation of due process.

The district court granted summary judgment in favor of the IRS, holding that the government's retroactive amendment to section 2057 does not violate the Due Process Clause. First, the court rejected Ferman's argument that "she could not have foreseen Congress' retroactive amendment of section 2057 because no legislative action took place until after she completed the stock transfers at issue." *Ferman,* 790 F.Supp. at 661. According to the district court, "Notice 87-13 forewarned what the future could and ultimately did bring." *Id.* The court also stated that "[i]t would seem abundantly clear that, given the IRS' position, Congress would enact corrective and retroactive legislation at the earliest possible time." *Id.* The district court also noted that, "[w]hile the net effect of the 1987 amendments to section 2057 clearly denied the Paglin estate the benefits of the fifty percent deduction, such denial did not amount to a "new tax' as contemplated by the relevant law." *Id.*

Finally, the district court dismissed the estate's reliance upon such cases as *Untermyer v. Anderson,* 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928), and *Blodgett v. Holden,* 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206, *modified,* 276 U.S. 594, 48 S.Ct. 105, 72 L.Ed. 206 (1928), where the Supreme Court refused to subject gifts to the gift tax where they were completed before the first gift

tax had even been implemented. The district court recognized that, in *United States v. Hemme,* 476 U.S. 558, 106 S.Ct. 2071, 90 L.Ed.2d 538 (1986), the Supreme Court limited *Untermyer* to its facts, specifically stating that *Untermyer* is of questionable value in assessing the constitutionality of amendments that bring about changes in the operation of *existing* tax laws. Accordingly, the district court distinguished *Untermyer* and *Blodgett* from the case before us on the grounds that this case "does not involve a new estate tax on intervivos gifts but, rather, a change in the application of an estate tax deduction." *Id.* at 662. In sum, although the district court stated that, "[i]n all candor, the court, in this instance, sincerely hopes that, should its judgment be appealed, the court (or courts) above will find error in this ruling[,]" it concluded that "it is true beyond peradventure that Congress may surely correct any error or inadvertence it may have created; indeed, Congress is constitutionally able to change and modify our nation's tax laws at will." *Id.* at 662-63.

## II. ANALYSIS

The parties have stipulated that (1) the government erred in drafting section 2057 in that it failed to properly estimate the cost to the United States Treasury resulting from the deduction created under this section, (2) the government's statutory power to tax generally includes the discretion to correct such mistakes, and, (3) solely as a result of this deduction, Ferman entered into transactions which, although they benefited the estate under the unamended version of section 2057, were otherwise to the detriment of the estate in the amount of $49,057.50.[4] On appeal, Ferman contends that she reasonably relied upon section 2057 when entering into the transactions at issue between February 20 and February 24, 1987. The government contends that (1) it acted within its taxing authority in applying its 1987 amendment to section 2057 retroactively, for this amendment constitutes an adjustment to an existing tax rather than a new tax, and (2) Ferman's reliance on section 2057 was not reasonable in light of (a) Notice 87-113, (b) the legislative history behind section 2057, and (c) the extent of the government's error in drafting section 2057. Accordingly, the issue before us constitutes a question of law: We must determine whether, in the context of the facts

---

[4]This amount constitutes the aggregate of (1) the broker's commissions paid by the estate when it purchased the ALZA stock and (2) the discounts given to the ALZA ESOP on the price of the stock.

before us, the government's retroactive application of its amendment to section 2057 constitutes a violation of due process or a legitimate exercise of the government's statutory power to tax.

The Supreme Court has held that the retroactive application of a tax statute violates the Due Process Clause where the result is "so harsh and oppressive as to transgress the constitutional limitation." *Hemme,* 476 U.S. at 568-69, 106 S.Ct. at 2078, *quoting Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 125, 83 L.Ed. 87 (1938).[5]  In making such a determination, courts must "consider the nature of the tax and the circumstances in which it is laid...." *Hemme,* 476 U.S. at 568-69, 106 S.Ct. at 2078.

In *Welch,* the case in which the Court introduced this "harsh and oppressive" impact standard, a Wisconsin taxpayer challenged the state's imposition of additional taxes arising from a change in the tax rate on corporate dividends received by the taxpayer one and two years earlier.  Although it had previously struck down retroactive taxes on gifts,[6] the Court upheld the Wisconsin statute by distinguishing the tax at issue from gift taxes.  Specifically, the Court held that

> a tax on the receipt of income is not comparable to a gift tax.  We cannot assume that stockholders would refuse to receive corporate dividends even if they knew that their receipt would later be subjected to a new tax or to the increase of an old one....

305 U.S. at 148, 59 S.Ct. at 126.  The Court then went on to place the right to tax income retroactively within the realm of the broad taxing power of legislatures, stating that

> [w]e cannot say that the due process which the Constitution exacts denies that opportunity to legislatures;  that it withholds from them, more than in the case of a prospective tax, authority to distribute the increased tax burden in the light of experience and in conformity with accepted notions of the requirements of equal protection;  or that in view of well established legislative practice, both state and national, taxpayers can justly assert surprise or complain of arbitrary action in the retroactive apportionment of tax burdens to income at the first opportunity after knowledge of the nature and amount of the income is available.

---

[5]Outside of the tax context, the Court has held that the retroactive application of a statute must be "arbitrary and irrational" to violate due process. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).  Nevertheless, this difference is actually just one of semantics, for the Court has held that the "harsh and oppressive" impact standard used in the tax context "does not differ from the prohibition against arbitrary and irrational legislation that we clearly enunciated in *Turner Elkhorn.*" *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 733, 104 S.Ct. 2709, 2720, 81 L.Ed.2d 601 (1984).

[6]*See Untermyer,* 276 U.S. at 440, 48 S.Ct. at 353;  *Blodgett,* 275 U.S. at 142, 48 S.Ct. at 105; *Nichols v. Coolidge,* 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184 (1927).

Id. at 149-150, 59 S.Ct. at 127.

In cases decided subsequently to *Welch* and the *Nichols-Blodgett-Untermyer* trilogy, the Court has drawn a clearer distinction between the retroactive imposition of a wholly new tax and a retroactive change in the base or rate of an existing tax. *See, e.g., Hemme,* 476 U.S. at 568, 106 S.Ct. at 2077; *United States v. Darusmont,* 449 U.S. 292, 299, 101 S.Ct. 549, 553, 66 L.Ed.2d 513 (1981).[7] In *Darusmont,* the Court considered a challenge to the retroactive application of a minimum tax provision which increased the tax due from the sale of a taxpayers' home which had occurred before the provision was enacted. After stating that "[t]he proposed increase in rate had been under public discussion for almost a year before its enactment" and that taxpayers were therefore in no position to claim surprise, the Court held that taxpayers' " 'new tax' argument is answered completely by the fact that the 1976 amendments to the minimum tax did not create a new tax." 449 U.S. at 299- 300, 101 S.Ct. at 553. Similarly, in *Hemme,* the trustee of a taxpayer's estate challenged the retroactive application of a transitional rule bridging the gap between new and old regimes for federal taxation of gifts and estates. Applying the "harsh and oppressive" impact standard introduced in *Welch,* the Court "considered the nature of the tax and the circumstances in which it [was] laid...." 476 U.S. at 568-69, 106 S.Ct. at 2078. The Court, without determining whether the provision at issue constituted retroactive taxation, held that "the provision represents a fair judgment by Congress that does not deprive appellees of anything to which they can assert a constitutional right." *Id.* at

---

[7]This court and our sister circuits also have recognized the distinction between a retroactive change in existing tax law and the retroactive imposition of a wholly new tax, thereby limiting *Nichols, Blodgett,* and *Untermyer* to their facts. *See, e.g., Wiggins v. Commissioner,* 904 F.2d 311, 314 (5th Cir.1990) (upholding retroactive exclusion of investment tax credit recapture when calculating an alternative minimum tax); *Estate of Ekins v. Commissioner,* 797 F.2d 481, 484 (7th Cir.1986) (upholding the retroactive repeal of an estate tax exclusion for life insurance policies); *Fein v. United States,* 730 F.2d 1211, 1213 (8th Cir.), *cert. denied,* 469 U.S. 858, 105 S.Ct. 188, 83 L.Ed.2d 121 (1984) (same); *Estate of Ceppi v. Commissioner,* 698 F.2d 17, 21 (1st Cir.1983), *cert. denied,* 462 U.S. 1120, 103 S.Ct. 3088, 77 L.Ed.2d 1350 (1983) (upholding the retroactive repeal of an estate tax exclusion); *Westwick v. Commissioner,* 636 F.2d 291, 292 (10th Cir.1980) (retroactive changes in the minimum tax upheld in spite of detrimental reliance); *First National Bank * MESSAGE(S) *MORE SECTIONS FOLLOWin Dallas v. United States,* 420 F.2d 725, 730 n. 8, 190 Ct.Cl. 400 (1970) (interest equalization tax on foreign stock acquisitions may be retroactively applied), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1868, 26 L.Ed.2d 289 (1970); *Sidney v. Commissioner,* 273 F.2d 928, 932 (2d Cir.1960) (upholding retroactive taxation of gains realized from collapsible corporations).

571, 106 S.Ct. at 2079.

The change in tax law at issue in the case before us—the retroactive amendment to (and limitation of) a deduction created under the Tax Act of 1986—cannot be characterized as a retroactive imposition of a wholly new tax. The estate tax was in place before section 2057 was introduced, and the amendment at issue simply limited the deduction provided under 2057, thereby restoring the pre-section 2057 status quo. To determine whether the retroactive amendment of section 2057 constitutes a change in tax law "so harsh and oppressive as to transgress the constitutional limitation[,]"[8] we must carefully consider the nature of the tax and the facts before us. *Hemme,* 476 U.S. at 568-69, 106 S.Ct. at 2078; *cf. Wiggins,* 904 F.2d at 316 (when retroactive legislation is challenged on due process grounds, a case-by-case analysis is required).[9]

Evaluating the government's retroactive amendment of section 2057 in the context of the facts before us, we conclude that the government did not inflict a "harsh and oppressive" change in tax law upon Paglin's estate. First, Notice 87-13 was formally published on January 25, 1987—nearly a month *before* Ferman entered into the series of transactions at issue in this case. This fact distinguishes the case before us from the Ninth Circuit's opinion in *Carlton v. United States,* 972 F.2d 1051 (9th Cir.1992). Specifically, although *Carlton* also involved an executor's reliance on section 2057, the executor in that case entered the transaction at issue nearly one month *before* the IRS issued Notice 87-13. In reaching its conclusion that, as applied to Carlton's transaction, Congress' amendment to section 2057 violated the Due Process Clause, the Ninth Circuit was careful to distinguish the district court opinion in the instant case and to clarify that its "conclusion would likely be entirely different if Carlton had engaged in his transaction after January 5, 1987." *Id.* at 1062, *citing Ferman,* 790 F.Supp. at 656.

---

[8]*Hemme,* 476 U.S. at 568-69, 106 S.Ct. at 2078, *quoting Welch,* 305 U.S. at 147, 59 S.Ct. at 125.

[9]In *Wiggins,* this court held that a retroactive amendment establishing an investment tax credit recapture constituted a correction rather than a new tax. 904 F.2d at 314. Specifically, we stated that "[t]he legislative history of the 1984 amendment indicates that this was not a new tax, but a correction necessary to effectuate Congress' intent in enacting [the Tax Equity and Fiscal Responsibility Act of 1982]." *Id.*

Although Notice 87-13 did not carry the authority of binding law, it did notify taxpayers of the possibility that section 2057 would be amended, how section 2057 might be amended, and the fact that there was risk associated with entering into transactions solely out of reliance upon section 2057. To hold that Notice 87-13 had no such effect would be to invite taxpayers to use such notices—which, as is established in the record, are issued by the IRS to inform Congress of its errors in drafting tax legislation—to locate Congress' mistakes and exploit them before they are corrected. Moreover, although one month may not constitute abundant notice, Ferman and her attorneys had every reason to remain observant for signs of change to section 2057. Specifically, although the transactions at issue cost the decedent's estate $49,057.50 in the form of deductions given to the ALZA ESOP, these transactions, in the absence of an amendment to section 2057, subjected the estate to a relatively low amount of risk and reduced its taxable amount by $466,046.25, or twenty-five percent. The result was a $177,362.03 reduction in federal estate tax. Although it is indisputable that section 2057 was passed to encourage the growth of ESOPs, the transactions at issue brought about an immediate benefit to the estate—and cost to the federal government through lost tax revenue—that was nearly four times greater than the deductions received by the ALZA ESOP.[10] Accordingly, we conclude that Notice 87-13 reasonably forewarned Ferman and her attorneys of Congress' amendment to section 2057. *See Milliken v. United States,* 283 U.S. 15, 21-24, 51 S.Ct. 324, 327, 75 L.Ed. 809 (1931) (upholding a retroactive gift tax where the donor was forewarned of the possibility of this tax); *Estate of Ekins v. Commissioner,* 797 F.2d 481, 484 (7th Cir.1986) ("[T]he application of a tax statute will not amount to a deprivation of property without

---

[10]As stated by Judge Norris in his dissent to the *Carlton* majority opinion,

> [T]he statute on its face offered a benefit that appeared "too good to be true." Admittedly, a number of laws provide tax incentives to encourage the growth of ESOPs, in some cases subsidizing third parties for facilitating the transfer of employer securities to an ESOP.... But the outcome in this case ... demonstrates that the deduction as drafted offered a subsidy of a wholly different magnitude from existing provisions. Congress could more providently have underwritten ESOP stock purchases directly from the U.S. Treasury without bringing in estate executors as middlemen!

972 F.2d at 1066.

due process of law if it meets two tests: the change is reasonably foreseeable and is only a fluctuation in the tax rate instead of a wholly new tax.").

Second, in amending section 2057, Congress was careful not to completely eliminate the deduction for taxpayers who relied upon it in their estate planning, as indicated by their (1) directly purchasing the securities before their deaths and (2) providing that these securities be allocated or held for future allocation in specified ways. *See* Pub.L. No. 100-203 § 10411, 101 Stat. 1330, 1330-432 (1987).[11] The transactions at issue in the case before us, rather than being part of Paglin's estate planning, were entered into after his death solely to take advantage of the deduction offered under section 2057.

When regulating economic activity, Congress generally enjoys wide latitude to legislate retroactively. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717-18, 81 L.Ed.2d 601 (1984);[12] *see also supra* note 5 (equating the standards of review

---

[11]Section 10411(d) provides that:

> (1) *In general.*—For purposes of this section, the proceeds of a sale of employer securities by an executor to an employee stock ownership plan or an eligible worker-owned cooperative shall not be treated as qualified proceeds from a qualified sale unless—
>
> (A) the decedent directly owned the securities immediately before death, and
>
> (B) after the sale, the employer securities—
>
> (i) are allocated to participants, or
>
> (ii) are held for future allocation in connection with
>
> (I) an exempt loan under the rules of section 4975, or
>
> (II) a transfer of assets under the rules of section 4980(c)(3).

[12]In *Pension,* the Court explained that:

> the strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches....

467 U.S. at 729, 104 S.Ct. at 2717-18.

for the retroactive application of statutes in and outside of the tax context). Moreover, the Supreme Court observed long ago that "[n]o more essential or important power has been conferred upon the Congress [than the power to collect taxes and raise revenues,] and the presumption that an Act of Congress is valid applies with added force and weight to a levy of public revenue." *United States v. Jacobs,* 306 U.S. 363, 370, 59 S.Ct. 551, 555, 83 L.Ed. 763 (1939) (footnote omitted). Although Congress acted retroactively when amending section 2057, it was merely correcting a substantial error[13] publicly acknowledged through Notice 87-13 just three months after that error was made. Proposed legislation confirming the position taken by the IRS in Notice 87-13 was introduced into Congress the following month. And, at the time section 2057 was actually amended (just one week after Ferman filed a refund claim with the IRS for $177,362.03), the deduction had been in existence for just a little more than one year. *See Wiggins,* 904 F.2d at 315 (in upholding a corrective tax statute applied retroactively, stating that "[w]here legislation is curative, retroactive application may be constitutional despite a long period of retroactivity"); *cf. United States v. Hudson,* 299 U.S. 498, 500, 57 S.Ct. 309, 310, 81 L.Ed. 370 (1937) ("[I]t long has been the practice of Congress to make [income tax statutes] ... retroactive for relatively short periods so as to include profits from transactions consummated while the statute was in process of enactment....") (citations omitted). Having analyzed the effect of Congress' retroactive amendment to section 2057 in the context of the facts before us, we conclude that limiting the scope of section 2057 to exclude the transactions at issue in this case does not constitute a change in tax law "so harsh and oppressive as to transgress the constitutional limitation." *Hemme,* 476 U.S. at 568-69, 106 S.Ct. at 2078; *Welch,* 305 U.S. at 147, 59 S.Ct. at 125.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the government.

---

[13]Congress anticipated that the revenue loss resulting from the passage of section 2057 would be approximately $300 million. Because section 2057 was not specifically limited to instances where the decedent owned the employer securities at the time of his or her death, the potential revenue loss resulting from 2057 as originally drafted was estimated at $7 billion. *See* 133 CONG.REC. H845 (daily ed. Feb. 26, 1987).