1997 ND 11

### In the Matter of the ESTATE OF Fern L. BROWN, Deceased.

**AMERICAN CANCER SOCIETY, Minnesota Division, and the American Heart Association, Minnesota Affiliate, Inc., Petitioners and Appellants,**

v.

**Shirley UNRUH, Personal Representative of the Estate of Fern L. Brown; and Shirley Unruh in her individual capacity as an heir, Jacqueline From, Dennis Cofell, Mary Ann Toevs, William Cofell, Elizabeth Wold, Eugene Cofell, Carolyn Cofell, Donna Woodward, Shelle Litterer, Beverly Rathbun, Loin Scouten, Mark Siemers, Scott Siemers, Ann McKinnon, and Nancy McKinnon, Respondents and Appellees.**

Civil No. 960023.

Supreme Court of North Dakota.

Feb. 3, 1997.

Stringer & Rohleder, St. Paul, MN, for petitioner and appellant American Cancer Society; argued by Harry T. Neimeyer; Ottmar & Ottmar, Jamestown, for petitioners and appellants.

Appearance by Timothy J. Ottmar; Martin H. Fisk of Briggs & Morgan, St. Paul, MN, for petitioner and appellant American Heart Association, on brief.

Larson Law Firm, Jamestown, for respondent and appellee Shirley Unruh; argued by Joseph F. Larson II.

Wheeler Wolf, Bismarck, for respondents and appellees heirs; argued by Michael L. Wagner.

MESCHKE, Justice.

[¶ 1] The American Cancer Society and the American Heart Association appeal from a judgment that construed Fern L. Brown's will to have made a formula gift of over $450,000 to a group of nineteen persons that resulted in estate taxes of $173,467 and left nothing for the six residual charities. We reverse and remand with instructions.

[¶ 2] To write her will in 1992, Brown met with attorney Mark Scallon, who had not known her before. Brown told him that, after a modest gift to her church, she wanted to give the amount her estate could claim exempt under the unified credit for federal estate taxes to a group of named persons in equal shares, and to give the rest of her substantial estate to six named charities. She discussed minimizing estate taxes that way.

[¶ 3] Scallon explained to Brown the unified credit's exemption equivalent of $600,000 would be reduced in her probate estate by her non-probate transfers outside her will, including all lifetime gifts above $10,000 annually, accounts paid on death, and jointly held property. Unaccountably, Brown told Scallon that she had made no prior taxable gifts and did not have accounts payable on her death, but that she did hold some joint property.

[¶ 4] Scallon's then partner, Dan Diemert, drafted the will with a formula group gift that was defined by what her estate "may claim" under the unified credit, but that referred expressly only to joint property, since that was the only non-probate transfer by Brown the lawyers expected. Deimert drafted the group gift in Article IV.B. to say:

To the individuals herein listed, I specifically devise *the amount of monies my estate may claim under the Unified Credit of Section 2010 of the Internal Revenue Code.* Any properties jointly held by me

and another individual shall be included in this amount up to the actual value of my interest at the date of my death. The individuals to whom I give this devise are as follows: [twenty-two persons listed]. Should any of these individuals fail to survive me, then it is my direction that such person's share shall be divided equally amongst those listed persons who still survive me at the date of my death.

(emphasis added). As Brown wished, Diemert drafted Article V to give the residue equally to six named charitable organizations qualified under the Internal Revenue Code, including the American Cancer Society and the American Heart Association.

[¶ 5] When Scallon reviewed the proposed will with Brown, he explained that it did not express the dollar amount of the group gift to avoid future changes in the will if circumstances affected application of the unified credit.[1] Brown executed the will on September 22, 1992, and later executed a codicil to drop one group beneficiary and to change her personal representative. On January 24, 1994, Brown died.

[¶ 6] The trial court authorized informal probate of Brown's will and appointed the personal representative of her estate. On November 15, 1994, the personal representative petitioned to confirm distribution of $5,000 to the Edgeley Methodist Church and of $23,685 to each of the surviving nineteen persons in the group gift, out of probate assets of $654,052. Brown's probate assets combined with taxable non-probate transfers of $446,337 made her estate nearly $1,050,000 for estate tax purposes (not counting probate expenses of over $50,000).

[¶ 7] The proposed distribution of $23,685 each from Brown's probate assets to the nineteen group survivors totaled $450,015. This proposed group gift, when combined with her taxable non-probate transfers of $42,572 in joint property, $117,479 in lifetime taxable gifts, and $286,286 in annuity ac-

---

1. Scallon testified:

A She asked why we didn't have $600,000.00 versus this the language that I had here about the unified credit.

Q And you explained to her how the unified credit worked?

A I—yeah—how I explained it to her was I told her well if the unified credit goes up, then we have to have you come back in if you want more, so we put it in here so that we don't have to bring you back in if it goes up to raise your dollar amount.

counts paid at Brown's death (in varying amounts that averaged $13,633 each to eighteen of the group-gift members and three other beneficiaries), made total taxable transfers of $896,352 that exceeded the $600,000 exemption equivalent of the unified credit by over $296,000.

[¶ 8] The size of the $896,352 taxable estate, including the proposed group gift of $450,015, resulted in payment of a state estate tax of $29,417 and a federal estate tax of $144,050, totaling $173,467 in estate taxes. The taxable effect of more than $700,000 in total transfers to the surviving nineteen persons in the group gift ($450,000 in probate transfers and $250,000 in prior non-probate annuities to the same persons), when combined with other non-probate transfers of nearly $200,000,[2] resulted in a total taxable estate of nearly $900,000 and estate taxes of $173,467. The resulting estate taxes left nothing for the stated residual gift to the six charities.

[¶ 9] For the charities, the American Cancer Society and American Heart Association objected:

> In essence, our objection is that the aggregate devises paid pursuant to the provisions of Article IV.B. [group gift] were excessive, resulting in a federal estate tax of $144,050 and a state estate tax of $29,-417, and that the amount distributed to said beneficiaries which resulted in said estate taxes should be distributed equally to the charities named in Article V of the decedent's Will and that, further, a refund of said taxes should be obtained and said refunded taxes should be similarly distributed to the charities.

[¶ 10] After a hearing, the trial court construed the will to be ambiguous, reasoning:

Article IV.B reads in part, "... the amount of monies my estate may claim under the Unified Credit of Section 2010 of the Internal Revenue Code." The words "Unified Credit" and "Internal Revenue Code" would certainly imply that Article IV.B relates to estate taxes. The clause does not state how estate taxes are involved. The individual heirs argue that the mention of Unified Credit means they are to get up to $600,000.00, the amount of exemption equivalent associated with the Unified Credit. The charities argue that Article IV.B shows the intention of Fern Brown to zero out taxes. The Court views both of these interpretations as reasonable and, therefore, the clause is ambiguous.

The trial court resolved the perceived ambiguity wholly for the group-gift beneficiaries, although it believed Brown intended the charities to get something.[3]

[¶ 11] The trial court reasoned that construing the group gift to be part of a design to minimize estate taxes would conflict with other will clauses that it interpreted to require payment of estate taxes from the residue before the residual charities got anything. The court believed, because the group gift of "the amount of monies my estate may claim under the Unified Credit of Section 2010 of the Internal Revenue Code" seemingly did "not state how estate taxes are involved," Brown's formula group gift intended transfer of the maximum amount possible from her probate estate up to a full $600,000, rather than a transfer of the remaining amount her estate could claim after non-probate transfers had reduced "the amount of monies [her] estate may claim under the Unified Credit."

2. Also, two group-gift beneficiaries named Siemers, with their spouses, received lifetime gifts from Brown through land transfers in 1986 and 1987 totaling $86,625. After total allowable annual exclusions of $80,000, the $6,625 balance became part of the $117,479 of taxable lifetime gifts. Another group-gift beneficiary, Mae Siemers, who Brown later removed by her codicil, together with her spouse, received lifetime land transfers in 1986 and 1987, totaling $150,854. After total allowable annual exclusions of $40,-000, the $110,854 balance became part of the lifetime taxable gifts of $117,499 included in

Brown's taxable estate. Thus, virtually all of her taxable estate of over $896,000 was distributed to Brown's group-gift beneficiaries and exceeded the exemption equivalent to the unified credit by over $296,000.

3. The trial court explained:

> The Court is uncomfortable with this ruling which will allow the personal heirs to have the remainder of Fern Brown's estate after the taxes are paid. The Court does believe th[at] Ms. Brown did intend for the charities to get some of her estate....

[¶ 12] On appeal, the charities argue that the trial court's construction of the will was wrong. They contend the will is not ambiguous because the group gift of what Brown's probate estate may claim as exempt under the unified credit and the deductible residual gifts to charities were designed to save federal estate taxes by combining the use of exemptions and deductions in the federal estate tax law. Alternatively, the charities contend the extrinsic evidence at the trial clarified that any possible will ambiguity was part of a plan to minimize estate taxes.

[¶ 13] Not surprisingly, the group beneficiaries also contend that the group gift unambiguously intended to give the maximum amount possible to the group from Brown's probate estate, up to an amount equal to a full $600,000, without intending to minimize estate taxes. We reject this contention and agree with the charities.

[¶ 14] Despite the trial court's belief that the group gift did "not state how estate taxes are involved," Brown's group gift does specify how estate taxes affect the size of the group gift. By using the unified credit in the Internal Revenue Code to define the group gift, Brown's will defined the amount her probate estate "may claim" as exempt under the unified credit to be only what is left after taxable non-probate transfers have reduced the effect of the unified credit for gifts from her probate estate. We conclude the trial court's construction of the will was wrong because, construing the will as a whole, Brown unambiguously intended to benefit the charities with the amount saved in estate taxes after a group gift of only, we emphasize, the *amount* of monies *my estate may claim* under the Unified Credit."

[¶ 15] Courts must construe a will to find the testator's intent from full consideration of the will in light of surrounding circumstances. *Matter of Estate of Johnson,* 501 N.W.2d 342, 345 (N.D.1993). Whether an ambiguity exists in a will is a question of law for the court to decide. *Matter of Estate of Zimbleman,* 539 N.W.2d 67, 71 (N.D.1995). A will is ambiguous only if it has more than one reasonable interpretation. *Estate of Johnson,* 501 N.W.2d at 345; *Schatz v. Schatz,* 419 N.W.2d 903, 906 (N.D.1988). If a will is ambiguous, extrinsic evidence can be used to aid in clarifying the ambiguity. *Id.*

As we held in *Schatz,* 419 N.W.2d at 907, resolution of an ambiguity by extrinsic evidence is a finding of fact that will not be set aside unless it is clearly erroneous. Here, we conclude this group gift was unambiguous, and that both the will's context and the extrinsic evidence reinforce this conclusion.

[¶ 16] Where the language of a will is clear and unambiguous, the intent of the decedent must be determined from the language of the will itself. *Jordan v. Anderson,* 421 N.W.2d 816, 818 (N.D.1988). Unless a duly executed will is ambiguous, the testamentary intent is derived from the will itself, not from extrinsic evidence. *Matter of Estate of Ostby,* 479 N.W.2d 866, 871 (N.D. 1992). Once it is shown that the will was properly executed, "the executed will *is* the decedent's testamentary intent." *Id.* The purpose of drafting and executing an unambiguous will is to give it legal effect upon death. *Matter of Estate of Duemeland,* 528 N.W.2d 369, 371 (N.D.1995). A contrary holding would leave every will open to attack as to the testator's alleged "real" intent, and would deprive decedents of any certainty about the eventual disposition of their estates. *Id.*

[¶ 17] The technical context of the Internal Revenue Code shapes the meaning of what Brown's "estate may claim under the Unified Credit of Section 2010 of the Internal Revenue Code." Technical words used in a will should be construed according to their technical meaning by reference to their technical context, unless a contrary intention is plainly expressed in the will. 80 AmJur2d *Wills* § 1158 (1975); *see also* NDCC 1–02–03 (part)("Technical words and phrases and such others as have acquired a peculiar and appropriate meaning in law, or as are defined by statute, must be construed according to such peculiar and appropriate meaning or definition.").

[¶ 18] The federal estate tax is not imposed upon any particular devise, legacy, or transfer, but rather it is imposed upon the transfer of a decedent's entire taxable estate. I.R.C. § 2001(a). The former gift and estate taxes, with different credits for lifetime transfers and for post-death transfers, have been integrated and unified into a single

unified tax with a single unified credit. I.R.C. §§ 2001, 2010.[4] One rate schedule applies to the entire taxable estate, including both pre-death and post-death transfers, so the values of lifetime and non-probate transfers increase the taxable estate and the applicable tax bracket. I.R.C. § 2001(c). The unified tax schedule begins at a rate of 18 percent on amounts under $10,000, and progresses to a top rate of 55 percent for that part of a taxable estate over three million dollars. *Id.* Under I.R.C. § 2001(b), to compute the tentative tax for a decedent's estate, the unified tax schedule must be applied to the whole taxable estate.

[¶ 19] Before any tax must be paid, however, a single unified credit is available against the tentative tax computed under the unified tax schedule. I.R.C. § 2010(a). Under I.R.C. § 2010(a), the present unified credit against the tentative tax is $192,800, and the effect of this unified credit exempts up to $600,000 from taxation.

■ [¶ 20] The unified credit is exhausted before any tax is due and payable and, to the extent the credit is used for lifetime and non-probate transfers, the credit is not available to reduce the estate tax for additional transfers from the probate estate. "The credit is exhausted before any tax is due, and to the extent it is used against lifetime transfers, it is not available to reduce the estate tax." 10 Rabkin and Johnson, Current Legal Forms With Tax Analysis, § 7.02[2]("Federal Estate Tax: In General," "Unified Credit") (1994). According to 1 R.I.A.'s Analysis of Federal Taxes: Estate & Gift ¶ 45,107 (1995)(citing Joint Committee Report (PL 94–455) p. 531): "Application of the unified credit is mandatory with respect to transfers in the order of time in which they are made."[5]

[¶ 21] To summarize, federal estate taxes are due only when the value of the decedent's

---

**4.** In *United States v. Hemme,* 476 U.S. 558, 560–61, 106 S.Ct. 2071, 2073–74, 90 L.Ed.2d 538 (1986), Justice Marshall explained for the Court the history of unifying the gift and estate taxes:

> In considering tax reform in 1976, Congress determined that several changes were necessary to ease the burden of estate and gift taxes on taxpayers of modest means. See H.R.Rep. No. 94–1380, p. 11 (1976). One such change was to transform what had been tax deductions into tax credits so that taxpayers in the lower brackets would benefit as much as those in higher brackets. [footnote: A credit has greater value to the taxpayer than a deduction or exemption. A credit directly reduces the amount of tax that must be paid, dollar for dollar, whereas a deduction reduces tax liability only indirectly by reducing the taxable estate. See R. Stephens, G. Maxfield & S. Lind, Federal Estate and Gift Taxation ¶ 3.01 (4th ed.1978).] *Id.,* at 15. In addition, Congress decided to merge the two separate specific exemptions for gifts and estates into a single credit, believing that the prior system had favored those who could afford to make substantial lifetime transfers, while disadvantaging those who needed to maintain access to their assets until death. *Id.,* at 16. Accordingly, the Tax Reform Act of 1976 (Act) erased many of the distinctions in treatment between transfers during life and those after death, in effect treating inheritance as the final taxable gift. It created the so-called "unified credit," which a taxpayer could apply either toward gift tax during life or toward estate tax after death. 26 U.S.C. §§ 2010(a), 2505(a). The $30,000 specific exemption for gifts and $60,000 specific exemption for estates were eliminated, beginning with estates of taxpayers dying after December 31, 1976, and gifts given after that date. A phase-in schedule was established for the amount of the new unified credit, providing a credit of $30,000 for taxpayers dying in 1977, $34,000 for those dying in 1978, and culminating in $47,000 for decedents dying in 1981 and thereafter. 26 U.S.C. §§ 2010(b), 2505(b)(1976 ed.).

Since then, the unified credit has been increased to $192,800, which is equivalent to an exemption of $600,000.

**5.** A *General Explanation of the Tax Reform Act of 1976* (December 29, 1976), prepared by the staff of the Joint Committee on Taxation of the Congress of the United States, explained at 531:

> In general, any portion of the unified credit used against gift taxes will reduce the credit available to be used against the estate tax. The unified credit rules are set forth separately under the estate and gift tax provisions of the Act. Since the credit used against gift taxes is reflected as a reduction in gift taxes payable, for purposes of determining the estate tax payable, a corresponding estate tax provision is set forth separately to preserve the effect of the credit. However, because of the interrelationship of the separate credit and the computation of the estate tax payable, the separate estate tax credit provision does not operate to permit the allowance of the credit both as to lifetime transfers and also as to death-time transfers. Thus, the credit is in effect a single unified credit for estate and gift tax purposes. In addition, the application of the unified credit is mandatory with respect to transfers in the order of time in which they are made.

total taxable estate exceeds $600,000. *See* I.R.C. §§ 2001(c)(1), 2010(a). For a taxable estate below $600,000, the unified credit offsets all gift and estate tax liability. The effective tax rates on the value of taxable transfers over $600,000 generally range from 37 percent to 55 percent. I.R.C. § 2001(c)(1), (2). Most transfers to a spouse are not included in the taxable estate, I.R.C. § 2056, nor are transfers to charitable organizations. I.R.C. § 2055(a)(2) (allowing a deduction "from the value of the gross estate [for] the amount of all bequests, legacies, devises, or transfers—... to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes"). However, an estate valued over $600,000 by non-exempt and non-deductible taxable transfers must pay federal estate taxes on the value exceeding the $600,000 exemption equivalent to the unified credit.

[¶ 22] Here, the question is whether Brown's group gift, "the amount of monies my estate may claim under the Unified Credit," was intended by her to be a maximum-formula gift up to the entire $600,000 exemption-equivalent amount (if the size of her probate estate permitted it), or whether it was intended by Brown to be used with the exempt charitable gifts to save estate taxes. We conclude the maximum-formula-gift interpretation ignores the plain meaning of the phrase, "amount of monies [her] estate may claim under the unified credit," given its meaning in the Internal Revenue Code.

[¶ 23] While the trial court allowed extrinsic evidence to aid in construing the group gift, the court eventually concluded this evidence did not help because the will, read as a whole, intended the group gift as a maximum-formula amount, not as part of a plan to save estate taxes. The court reasoned from the directions in Article II to pay "inheritance and succession taxes, State or Federal, which may be occasioned by the passage of or succession to any interest of my estate," and from the first sentence of Article V to pay "all taxes ... out of the residue to this estate, if there is one." The court believed these directions were inconsistent with a plan to minimize estate taxes. "[T]o harmonize all of the provisions," the court construed Brown's "unified credit" gift to the group to

mean a maximum-formula amount, not the remaining unified-credit amount her "estate may claim" under the referenced Internal Revenue Code.

[¶ 24] We agree that courts must harmonize all parts of a will where possible. We have often held that each word, clause, and provision of a will should, if possible, be given effect. *Matter of Estate of Zimbleman*, 539 N.W.2d at 71; *Schatz v. Schatz*, 419 N.W.2d at 906; *Quandee v. Skene*, 321 N.W.2d 91, 95 (N.D.1982). However, we do not agree that the directions in Articles II and V to pay taxes are inconsistent with an intent to minimize estate taxes. There is another understandable reason for Brown's will to authorize payment of some estate taxes, yet intending to save them, that allows the residual gift to the charities to be given effect.

[¶ 25] In construing the direction to pay "all taxes" in Article V, the trial court awkwardly attempted to distinguish *Bushee v. Bushee*, 303 N.W.2d 320 (N.D.1981), where this court decided a will direction to pay "all of my ... taxes" did not include estate taxes. Rather, we concluded that the *Bushee* phrase should be "construed as a direction by the testator to pay all personal and business taxes owing by the decedent at the time of his death without any intent by the testator to thereby direct payment of estate taxes." *Id.* at 322. Here, this trial court compared "all taxes," the phrase in Brown's Article V, with only "taxes," the wording the trial court mistakenly believed to have been construed in *Bushee*. With that misunderstanding, this trial court reasoned that estate taxes "might be excluded from the word 'taxes' but not from the words 'all taxes', the phrase that appeared in Fern Brown's Will."

[¶ 26] We see no rational distinction between "all taxes" in Brown's will, and "all of my ... taxes" in Bushee's. Still, we agree that any estate taxes that might become payable for Brown's gift and estate transfers were impliedly intended to be paid out of the residue devised by Article V in view of the related, though ambiguous, direction in Article II to pay "inheritance and succession taxes, State or Federal."

[¶ 27] In construing Article II, the trial court correctly understood that North Dakota does not have either an inheritance or succession tax on inherited property, but rather has an estate tax in the maximum allowable as a credit in computing federal estate taxes.[6] *See* NDCC 57–37.1–04. The trial court then reasonably found that Brown actually intended to direct payment of any estate taxes due from her residuary estate, rather than by apportioning them. Without such a will direction under North Dakota law, estate taxes payable must be apportioned among all persons interested in the estate, NDCC 30.1–20–16(2), although "[a]ny credit for ... estate taxes ... applicable to property or interests includable in the estate, inures to the benefit of the persons or interests chargeable with the payment thereof to the extent proportionately that the credit reduces the tax." NDCC 30.1–20–16(5)(d). Unfortunately, the court concluded Brown's implied intent to pay estate taxes from the residue was completely inconsistent with an intent to save estate taxes because it could not see any reason why a testator would direct payment of estate taxes otherwise.

[¶ 28] We do not view an intent to pay necessary estate taxes as inconsistent with an intent to minimize estate taxes. It is not reasonable to conclude that Brown intended a group gift measured by "the amount of monies [her] estate may claim under the Unified Credit" without saving estate taxes. As Scallon carefully explained to Brown, the amount of the unified credit her probate estate "may claim" under the Internal Revenue Code is reduced by taxable lifetime and non-probate transfers. The implicit will directions to pay necessary estate taxes was simply a contingent safe-guard for a plan adaptable for changeable amounts of lifetime and non-probate transfers that might be made before the will went into effect.[7]

[¶ 29] If Brown had made more non-probate transfers at or before her death that exceeded the unified credit's exemption equivalent, some estate taxes would have become payable for those non-probate transfers despite a testamentary intent to save estate taxes in the will. Scallon discussed this very contingency with Brown:

> I informed her—and she said she was going to keep gifting under $10,000.00 to certain people. And she had told me that her estate was worth $750,000.00. So I said, "Well, there is a possibility that over a period of years you're gonna beyond the $600,000.00 and by time the expenses are deducted out, there will not be anything for the charities and that's when at that time she asked that the $5,000.00 bequest be put in for the Methodist Church."[8]

This contingency safeguard reasonably explains the will's implicit directions to pay any estate taxes that might be incurred, and it is entirely consistent with the plain meaning of the group gift to minimize estate taxes.

[¶ 30] This interpretation also gives meaning and effect to the residual gift to the charities. *See Mercy Hosp. of Williston v. Stillwell*, 358 N.W.2d 506, 509 (N.D.1984)("It is well recognized that charitable gifts are favored by the law and by the courts.... Courts will give effect to charitable gifts where it is possible to do so consistent with recognized rules of law.") (citations omitted). Thus, we conclude that the trial court incorrectly expanded the meaning of the unambiguous gift of the "amount of monies my estate may claim under the Unified Credit" to inappropriately defeat the residual charitable gifts.

6. The construction of Brown's will is made extraordinarily difficult by its clumsy preparation. Reference to "inheritance and succession taxes" in a will for a state that does not have those taxes is only one example of sloppy drafting. While Scallon tried to shift the responsibility to his former law partner who actually drafted the will, he reviewed it and was equally responsible.

7. The charities suggest that the tax payment directions in both Article II and Article V are boilerplate and should not be considered significant. Given the clumsy draftsmanship of this will, that may be a possibility. However, we need to give effect to each part of the will even if it might be boilerplate. Our construction of the tax payment clauses as a contingency safeguard does so without distorting the plain meaning of the group gift of what "my estate may claim under the Unified Credit."

8. Indeed, Brown added two annuities on December 9, 1992, after this will, one to group beneficiary Eugene Cofell for $10,170 and another to a non-group beneficiary Joacquin Cofell for $10,170.

[¶ 31] While the group gift was unambiguous on its face, we think, moreover, that Scallon's extrinsic evidence confirmed the intended effect of the "unified credit" group gift as part of a plan to minimize estate taxes. Scallon testified Brown discussed not wanting to pay estate taxes. Scallon explained to Brown the unified credit would be reduced by other taxable lifetime and non-probate transfers, although he described only jointly held property in the will because that was the only type he expected from what Brown told him. Scallon's discussion, planning, and drafting to save estate taxes for Brown are not consistent with a maximum-formula group gift that leaves no residue for the charities. Brown clearly intended the group gift to save estate taxes by utilizing the remaining exemption equivalent of the unified credit in her probate estate to enable charitable-deduction gifts to the residual beneficiaries.

[¶ 32] No doubt Brown intended her chosen non-exempt beneficiaries to get at least $600,000 from her total assets through combined non-probate and probate transfers that would be tax-free under the unified credit. That intention is implemented by recognizing the non-probate transfers, including the $250,000 in non-probate annuity accounts transferred to the group beneficiaries themselves.[9] This fits Brown's reference to the Internal Revenue Code. For the unified credit to work as Brown directed in her will and to give effect to the will's residual charitable gifts, the amount of her probate estate beyond what it "may claim under the Unified Credit" should benefit the designated residual charities. As Brown told Scallon: "why should [I] give the government this money when I can give it to the charities after my relatives have got this $600,000.00."

[¶ 33] We reverse and remand because the trial court mistakenly construed Brown's gift of "the amount of monies my estate may claim under the Unified Credit" as a maximum-formula gift although it was an expressed part of a design to save estate taxes. On remand, the trial court must compute the probate amount that Brown's group-gift beneficiaries get from her testamentary gift of

"the amount of monies my estate may claim under the Unified Credit," order each to return any amount received from her probate estate beyond a correctly computed share, and direct the personal representative to obtain a refund from the State and the Internal Revenue Service of the estate taxes incorrectly paid. Then, Brown's personal representative must be directed to distribute the remaining probate estate, after expenses, to the six charitable beneficiaries.

[¶ 34] VANDE WALLE, C.J., NEUMANN, J., and KIRK SMITH and MAURICE R. HUNKE, D.JJ., concur.

[¶ 35] KIRK SMITH, D.J., sitting in place of SANDSTROM, J., and MAURICE R. HUNKE, D.J., sitting in place of MARING, J., disqualified.

---

9. In addition to the $250,000 in non-probate annuities going to group gift beneficiaries, they and their family members received over $235,-

000 in lifetime gifts of land, all without estate taxes. See n. 2 ante.