IN THE SUPREME COURT OF NORTH CAROLINA

No. 62A23

Filed 13 December 2024

PHILIP MORRIS USA, INC., Petitioner

v.

NORTH CAROLINA DEPARTMENT OF REVENUE, Respondent

Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from an order and opinion on petition for review of final decision entered on 29 September 2022 by Judge Julianna Theall Earp, Special Superior Court Judge for Complex Business Cases, in Superior Court, Wake County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(b). Heard in the Supreme Court on 14 February 2024.

*Ward & Smith, P.A., by Alex C. Dale and Christopher S. Edwards; and Parker Poe Adams & Bernstein LLP, by Kay Miller Hobart and Dylan Z. Ray, for petitioner-appellant.*

*Joshua H. Stein, Attorney General, by Tania X. Laporte-Reveron, Assistant Attorney General, and Ronald D. Williams, Special Deputy Attorney General, for respondent-appellee.*

BARRINGER, Justice.

This matter involves a dispute between Philip Morris USA, Inc. (Philip Morris) and the North Carolina Department of Revenue (Department), related to tax credits available to manufacturers of cigarettes for exportation (Export Credits), carried forward from prior years' tax returns by the citizen taxpayer. The specific issue before

the Court is whether the "credit allowed" in N.C.G.S. § 105-130.45(b) (2003) (repealed effective 1 January 2018) limits the Export Credits claimed by Philip Morris such that the citizen taxpayer cannot carry forward to future years the Export Credits generated in prior years.

Therefore, to address that issue, the Court must determine what is meant by "credit allowed" in N.C.G.S. § 105-130.45, titled "credit for manufacturing cigarettes for exportation" (Export Credit Statute). Philip Morris and the Department each argue that the plain meaning of the statute supports their respective positions; however, since neither party's textual analysis provides a univocal interpretation, we find the statute ambiguous. For the reasons stated below, we hold that any generated Export Credit in excess of the annual statutorily defined cap may be carried forward for the succeeding ten years. Accordingly, we reverse the trial court's order of summary judgment in favor of the Department and remand this matter to the trial court for further proceedings not inconsistent with this opinion.

## Background

The Export Credit Statute allows cigarette manufacturers a tax credit based on the volume of cigarettes they manufactured in North Carolina for export each year. N.C.G.S. § 105-130.45 (2003). The Export Credit that may be taken or claimed in any tax year is "not [to] exceed the lesser of six million dollars ($6,000,000) or fifty percent (50%) of the amount of tax imposed by this Part for the taxable year." *Id.* § 105-130.45(c). "This limitation applies to the cumulative amount of the credit allowed in

any tax year, including carryforwards claimed by the taxpayer under this section for previous tax years." *Id.*

Philip Morris' cigarette exportation generated more than six million dollars of Export Credits in 2005 and 2006 but less than the cap in 2012, 2013, and 2014. Nevertheless, Philip Morris claimed the maximum six million dollars for tax years 2012, 2013, and 2014, carrying forward a portion of the generated but unclaimed Export Credits from 2005 and 2006.

The Department audited Philip Morris' corporate income tax returns for tax years 2012 through 2014.[1] The Department then issued a report disallowing Export Credits claimed by Philip Morris, followed by proposed assessments for each of the audited tax years. The Department disallowed Philip Morris' claimed credits because, according to the Department, the Export Credit Statute limits the credits that can be "generated." Accordingly, credits generated in a year are capped at six million dollars. Thus, according to the Department, Philip Morris had no credits available to carry forward as it had generated, and used, six million dollars in both 2005 and 2006. Philip Morris objected and requested review by the Department pursuant to N.C.G.S. § 105-241.11. Following review, the Department issued a Notice of Final Determination sustaining the proposed assessments.

Philip Morris then petitioned the Office of Administrative Hearings for a

---

[1] The Department conceded that all the Export Credits on the 2012 return and some on the 2013 return were proper. Therefore, these credits are not at issue.

contested tax case hearing. The parties filed cross-motions for summary judgment. The administrative law judge (ALJ) issued a final decision granting the Department's motion and denying Philip Morris' motion. Philip Morris then petitioned the superior court for judicial review of the final decision.

The trial court stated that "the amended Export Credit Statute plainly indicates that the General Assembly intended to limit credit generation to six million dollars per year effective 1 January 2005." On this basis, the trial court found that Philip Morris improperly claimed the excess Export Credits, carried forward from the 2005 and 2006 tax years, on its 2013 and 2014 returns. Accordingly, the trial court affirmed the final decision of the ALJ and granted summary judgment in favor of the Department.

Philip Morris now appeals the trial court's order and opinion to this Court, pursuant to N.C.G.S. § 7A-27(a)(2).

**Standard of Review**

Questions of law, including matters of statutory interpretation, are reviewed de novo. *Winkler v. N.C. State Bd. of Plumbing*, 374 N.C. 726, 729–30 (2020). " '[D]e novo' mean[s] fresh or anew; for a second time . . . ." *In re Hayes*, 261 N.C. 616, 622 (1964) (extraneity omitted).

**Analysis**

The Export Credit Statute, N.C.G.S. § 105-130.45,[2] reads in pertinent part:

(b)  Credit. -- A corporation engaged in the business of manufacturing cigarettes for exportation to a foreign country and that waterborne exports cigarettes and other tobacco products through the North Carolina State Ports during the taxable year is allowed a credit against the taxes levied by this Part. The amount of credit allowed under this section is determined by comparing the exportation volume of the corporation in the year for which the credit is claimed with the corporation's base year exportation volume, rounded to the nearest whole percentage. In the case of a successor in business, the amount of credit allowed under this section is determined by comparing the exportation volume of the corporation in the year for which the credit is claimed with all of the corporation's predecessor corporations' combined base year exportation volume, rounded to the nearest whole percentage. The amount of credit allowed may not exceed six million dollars ($6,000,000) . . . .

. . . .

(c)  Cap. -- The credit allowed under this section may not exceed the lesser of six million dollars ($6,000,000) or fifty percent (50%) of the amount of tax imposed by this Part for the taxable year reduced by the sum of all other credits allowable, except tax payments made by or on behalf of the taxpayer. This limitation applies to the cumulative amount of the credit allowed in any tax year, including carryforwards claimed by the taxpayer under this section for previous tax years. Any unused portion of a credit allowed in this section may be carried forward for the next succeeding ten years.

---

[2] We note that subsection (f), "Report," became effective 1 January 2007. *See* N.C.G.S. § 105-130.45(f) (2005). This has no bearing on our statutory analysis of the 2003 Amendment to the subject statute.

. . . .

(f) Report. -- The Department [of Revenue must publish by May 1 of each year] the following information itemized by taxpayer [for the 12-month period ending the preceding December 31]:

> (1) The number of taxpayers taking a credit allowed in this section.

> (2) The total amount of exports with respect to which credits were taken.

> (3) The total cost to the General Fund of the credits taken.

## A. Statutory Terms Defined

Since the propriety of allowing the tax credit carryforwards is the crux of this case, it is necessary to define these statutory terms. "If words at the time of their use had a well-known legal or technical meaning, they are to be so construed unless the [document at issue] itself discloses that another meaning was intended." *Wachovia Bank & Tr. Co. v. Waddell*, 237 N.C. 342, 346 (1953) (interpreting the meaning of "receipts" in a will); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) [hereinafter *Reading Law*] ("Words are to be understood in their ordinary, everyday meanings—*unless the context indicates that they bear a technical sense.*" (emphasis added)). Therefore, when a term has a well-known technical meaning in an industry or profession, such as accounting, the technical meaning rather than the plain meaning is favored.

A "carryforward" is "[a]n income-tax deduction [or credit] . . . that cannot be

taken entirely in a given period but may be taken in a later period." *Carryforward, Black's Law Dictionary* (8th ed. 2004) The Financial Accounting Standards Board (FASB) defines "carryforward" as "the amount by which tax credits available for utilization exceed statutory limitations." Fin. Acct. Stands. Bd., *Statement of Financial Accounting Standards* No. 109, at 112 (1992).[3] Therefore, examination of the carryforward allowed by the Export Credit Statute as recognized in the tax accounting industry is critical to our analysis.

In the context of the accounting industry and profession, a "credit" is "an amount that directly offsets tax liabilities." Richard A. Westin, *Lexicon of Tax Terminology* 154 (1984) [hereinafter *Lexicon*]. Furthermore, "[c]redits . . . reduce income taxes for the year." *Id. Black's Law Dictionary* defines "tax credit" as "an amount subtracted directly from one's total tax liability . . . as opposed to a deduction from gross income." *Tax Credit, Black's Law Dictionary* (8th ed. 2004). By contrast, a deduction is something that is or may be subtracted from one's gross income. *Deduction, Black's Law Dictionary* (8th ed. 2004); *see also Pittsburgh Brewing Co. v. Comm'r*, 107 F.2d 155, 156 (3d Cir. 1939).

---

[3] "The FASB is recognized by the U.S. Securities and Exchange Commission as the designated accounting standard setter for public companies. FASB standards are recognized as authoritative by many other organizations, including state Boards of Accountancy and the American Institute of CPAs (AICPA). The FASB develops and issues financial accounting standards through a transparent and inclusive process intended to promote financial reporting that provides useful information to investors and others who use financial reports." Fin. Acct. Stands. Bd., *About the FASB*, https://www.fasb.org/about-us/about-the-fasb (last visited Nov. 29, 2024).

The meaning of "allow" as defined by *Merriam-Webster* includes, "to reckon as a deduction or an addition." *Allow, Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *accord Lexicon* 30 ("[A]llowed: the amount of depreciation actually claimed, whether or not legally excessive."). These definitions of "allow" are consistent with the Supreme Court of the United States' 1943 interpretation of "allowed." *Virginian Hotel Corp. v. Helvering*, 319 U.S. 523, 526–28, 526 n.7 (1943) (examining the meaning of "allowed depreciation deductions"). In *Virginian Hotel Corp.*, the Court states that " '[a]llowed' connotes a grant." *Id.* at 527. Furthermore, the Court states that "[d]eductions stand if the Commissioner takes no steps to challenge them. . . . If the deductions are not challenged, they certainly are 'allowed,' since tax liability is then determined on the basis of returns." *Id.*; *see also United States v. Hemme*, 476 U.S. 558, 565–66 (1986). This logic is consistent with interpreting the definition as meaning "to exist" or "to claim."

Since 1943, the Supreme Court of the United States has interpreted the word "allowed" to mean "claimed." *See Virginian Hotel Corp.*, 319 U.S. at 526–28. "When a term has long-standing legal significance, it is presumed that legislators intended the same significance to attach by use of that term, absent indications to the contrary." *Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 550 (2018) (extraneity omitted).

As demonstrated by the foregoing definitions, the phrase "credit allowed" means the maximum credit a taxpayer may *claim*. Such an interpretation aligns with the technical use and long-standing meaning of the term in the accounting industry.

Consistent with this clear technical definition, the Department concedes that Philip Morris' interpretation of "credit allowed" in subsection (b) as claimed, and consequently what is allowed to be carried forward, is consistent with the Department's prior interpretation of N.C.G.S. § 105-130.45 before the 2003 Amendment to that statute.

To be sure, however, this technical definition does not allow a taxpayer to offset an unlimited amount of tax liability by claiming the credit. The statute caps a taxpayer's ability to offset its tax liability in any given year at "six million dollars ($6,000,000) or fifty percent (50%) of the amount of tax imposed by this Part for the taxable year reduced by the sum of all other credits allowable." N.C.G.S. § 105-130.45(c). This limitation also applies to the use of any unclaimed credit carryforward from previous years. "Any unused portion of a credit allowed . . . may be carried forward for the next succeeding ten years." *Id.*

## B. Ambiguous Use of "Credit Allowed"

Philip Morris and the Department each argue that the plain meaning of the Export Credit Statute supports their respective positions. Yet, a close reading of the statute reveals that "credit allowed" is used in two inconsistent ways—once in its technical meaning and once in its plain meaning—thus producing a statutory ambiguity.

Recently, this Court in *State v. Fritsche* summarized the analytical framework for engaging in statutory construction:

> When the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required. However, when the language of [the] statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment.

385 N.C. 446, 449 (2023) (quoting *In re R.L.C.*, 361 N.C. 287, 292 (2007)).

We have further clarified that in tax cases, "[w]hen a statute provides for an exemption from taxation, any ambiguities therein are resolved in favor of taxation." *Aronov v. Sec'y of Revenue*, 323 N.C. 132, 140 (1988) (citation omitted) (recognizing that "[d]eductions . . . are in the nature of exemptions"[4]). But, this tenet does not mean "game over," and that we should put down our pens and decline to analyze the language further. Instead, "[i]n cases of [any] ambiguous statutory language, we examine the language of the statute itself, the context, and what the legislation seeks to accomplish as the best indicators of the legislature's intent." *Fritsche*, 385 N.C. at 449. Moreover, "[c]anons of construction are interpretive guides, not metaphysical absolutes. They should not be applied to reach outcomes plainly at odds with legislative intent." *Town of Midland v. Harrell*, 385 N.C. 365, 376 (2023).

Subsection (c) uses the term "allowed" according to its technical meaning—"to claim." This subsection, entitled "Cap," establishes the cap or limit on the amount that a corporation may *claim* on its annual income tax return. This is consistent with the technical definition discussed above. As indicated by the statutory context and

---

[4] It follows that credits are in the nature of deductions and exemptions.

-10-

further clarified by the title "Cap," this subsection limits the amount of Export Credits that may be claimed annually. [5]

To reconcile this ambiguity and bring clarity and logical meaning to the statute, the context of the statute and the "whole text" canon require a plain meaning reading of "credit allowed" in subsection (b). "Generate" means "to define or originate (as a mathematical or linguistic set or structure) by the application of one or more rules or operations." *Generate, Merriam-Webster's Collegiate Dictionary* (11th ed. 2003). Here the statute provides the formula by which the "Export Credit Statute" is calculated each year: the amount by which the exportation volume of the corporation in the year exceeds the corporation's base year exportation volume, rounded to the nearest whole percentage. N.C.G.S. § 105-130.45(b). Based on this formulaic purpose of subsection (b), the dictionary definition, and the statutory context, the plain and logical meaning of "credit allowed" in subsection (b) is "generate."

The Department argues, and the trial court agreed, that the 2003 Amendment to the Export Credit Statute clarifies that credit "generated" for carryforward purposes is limited to six million dollars each year. We disagree. As stated above, the Department concedes that Philip Morris' interpretation of "credit allowed" prior to the 2003 Amendment did not limit the amount of Export Credit that could be

---

[5] The title to subsection (c), "Cap," serves to clarify that subsection (c) imposes a limit on the export credit's use. However, the title of subsection (b), "Credit," is not sufficiently specific to add clarity as to whether "credit allowed" means "credit generated" or "credit earned."

generated each year. So, what has changed?

The 2003 Amendment added the following language to subsection (b):

> *In the case of a successor in business*, the amount of credit allowed under this section is determined by comparing the exportation volume of the corporation in the year for which the credit is claimed with *all of the corporation's predecessor corporations' combined base year exportation volume*, rounded to the nearest whole percentage. The amount of credit allowed may not exceed six million dollars ($6,000,000).

*Id.* (2003) (emphases added). This amendment ensured that "a successor in business" could not claim its own six million dollar credit in addition to any carryforward credit available to its predecessors.

As stated above, the Department concedes that the *original* statute did not impose a limit on the amount of credit that could be generated each year. Here the legislature demonstrates by its word choice—"[i]n the case of a successor in business" and "all of the corporation's predecessor corporations' combined base year exportation volume"—that it did not amend the statute to change the amount of credit that could be generated and thus available for carryforward. Instead, its amendment is designed to prevent "double dipping" by a surviving corporation and a merged corporation, prohibiting both from taking advantage of the same credit and carryforward on their separate income tax returns. It is difficult to understand how this interpretation amounts to an absurd or bizarre consequence as the dissent contends.

Furthermore, the application of the doctrine of last antecedent bolsters this interpretation. "[R]elative and qualifying words, phrases, and clauses ordinarily are

to be applied to the word or phrase immediately preceding rather than extending to or including others more remote . . . ." *Wilkie*, 370 N.C. at 548–49 (extraneity omitted). The language at issue, "[t]he amount of credit allowed may not exceed six million dollars ($6,000,000)," follows directly after the sentence beginning, "[i]n the case of a successor in business" without even a paragraph break. N.C.G.S. § 105-130.45(b). Under this doctrine, the last sentence's "credit allowed" limitation can only relate to "successors in business."

Further support for the point that "credit generated" is not limited to six million dollars is found by comparing the subject statute with N.C.G.S. § 105-130.46, titled "credit for manufacturing cigarettes for exportation while increasing employment and utilizing state ports" (Enhanced Employment Credit Statute). These statutes are a part of the same session law and were adopted by the General Assembly on the same day. An Act to . . . Modify the Cigarette Exportation Tax Credit and Modify the Base Year . . . [and] Create an Enhanced Tax Credit for Cigarette Exportation, S.L. 2003-435, §§ 5.2-5.4, 6.1-6.2, 2003 N.C. Sess. Laws (2d Extra Sess. 2003) 1421, 1431–35. The Export Credit Statute incentivized increasing exports; the Enhanced Employment Credit Statute incentivized increasing employment. The Enhanced Employment Credit Statute reads as follows:

> (a) Purpose. -- The credit authorized by this section is intended to enhance the economy of this State by encouraging qualifying cigarette manufacturers to increase employment in this State with the purpose of expanding this State's economy, the use of the North Carolina State Ports, and the use of other State goods and

services, including tobacco.

. . . .

(d)  Credit. -- A corporation that satisfies the employment level requirement under subsection (c) of this section, is engaged in the business of manufacturing cigarettes for exportation, and exports cigarettes and other tobacco products through the North Carolina State Ports during the taxable year is allowed a credit as provided in this section. The amount of credit allowed under this section is equal to forty cents (40¢) per one thousand cigarettes exported. The amount of credit *earned* during the taxable year may not exceed ten million dollars ($10,000,000).

. . . .

(g)  Ceiling. -- The total amount of credit that may be taken in a taxable year under this section may not exceed the lesser of the amount of credit which may be *earned* for that year under subsection (d) of this section or fifty percent (50%) of the amount of tax against which the credit is taken for the taxable year reduced by the sum of all other credits allowable, except tax payments made by or on behalf of the taxpayer. This limitation applies to the cumulative amount of the credit allowed in any tax year, including carryforwards claimed by the taxpayer under this section or G.S. 105-130.45 for previous tax years.

. . . .

(k)  Reports. -- Any corporation that takes a credit under this section must submit an annual report by May 1 of each year to the Senate Finance Committee, the House of Representatives Finance Committee, the Senate Appropriations Committee, the House of Representatives Appropriations Committee, and the Fiscal Research Division of the General Assembly. The report must state the amount of credit *earned* by the corporation during the previous year, the amount of credit including carryforwards claimed by the corporation during the previous year, and the percentage of domestic leaf content

> in cigarettes produced by the corporation during the previous year. The first reports required under this section are due by May 1, 2006.

*Id.* § 105-130.46 (2004) (emphases added).

The term "earned" in the Enhanced Employment Credit Statute is conspicuously absent in the statute before us, indicating that the General Assembly clearly imposed a restriction in the Enhanced Employment Credit Statute on the amount of credit that can be generated. In subsection (d) of the Enhanced Employment Credit Statute, unlike the Export Credit Statute, the General Assembly clearly limited the amount of credit that could be generated by specifically stating that "[t]he amount of credit *earned* during the taxable year may not exceed ten million dollars ($10,000,000)." *Id.* § 105-130.46(d) (emphasis added). Then, in subsection (g), "Ceiling," it tied the amount of "credit earned" to the ceiling by stating: "The total amount of credit taken in a taxable year under this section may not exceed the lesser of the . . . credit which may be *earned*." *Id.* § 105-130.46(g) (emphasis added). This language demonstrates that the General Assembly clearly mandated that the amount "earned" was restricted as to both the amount of the Enhanced Employment Credit that could be generated and the amount of the Enhanced Employment Credit that could be claimed each year, thus limiting maximum carryover. No such limitation appears in the Export Credit Statute.

Statutes are to be read harmoniously in a way that renders them internally compatible, not contradictory. *Reading Law* 180–82; *e.g., Town of Pinebluff v. Moore*

*County*, 374 N.C. 254, 257 (2020); *Bd. of Adjustment v. Town of Swansboro*, 334 N.C. 421, 427 (1993); *Town of Blowing Rock v. Gregorie*, 243 N.C. 364, 371 (1956). Identical words used in legislation should have the same meaning; different words carry different meanings. *Reading Law* 170–73. The Enhanced Employment Credit Statute uses both of the terms "credit allowed" and "earned," indicating a difference in meaning between the terms. The subject statute does not use the term "earned" at all. Accordingly, "credit earned" and "credit allowed" must have different meanings.

Therefore, in answering our question, "what has changed?", only one change can be found. That change is the amendment to subsection (c) of section 105-130.45. However, that amendment merely increases the time frame for carryforward from five years to ten years. N.C.G.S. § 105-130.45(c) (2003). This does not alter our analysis.

## C. The Department's Inconsistent Interpretation of the Statute

The Department concedes that it has taken positions consistent with the interpretation set forth herein. Prior to the 2003 Amendment, the Department did not interpret N.C.G.S. § 105-130.45 to limit the amount of "credit generated." Thus, we begin our analysis with the Department's original interpretation.

At the time relevant to this case, N.C.G.S. § 105-264(a) provided, in part:

> It is the duty of the Secretary [of the Department of Revenue] to interpret all laws administered by the Secretary. The Secretary's interpretation of these laws shall be consistent with the applicable rules. An interpretation by the Secretary is prima facie correct. When the Secretary interprets a law by adopting a rule or

> publishing a bulletin or directive on the law, *the interpretation is a protection to the* officers and *taxpayers* affected by the interpretation, *and taxpayers are entitled to rely upon the interpretation.*[6]

N.C.G.S. § 105-264(a) (2012) (emphases added).[7] Indeed, this Court has even stated that "[i]n *all* tax cases, the construction placed upon the statute by the Secretary [ ] of Revenue . . . will be given due consideration by a reviewing court." *Aronov*, 323 N.C. at 140 (emphasis added) (citation omitted).

However—to clarify—this is not to say that *every* interpretation by the Secretary of Revenue is deserving of deference by a reviewing court. Subsection 105-264(a) makes clear that while "[a]n interpretation by the Secretary is prima facie correct," that "interpretation is a *protection to the . . . taxpayers* affected by the interpretation." N.C.G.S. § 105-264(a) (emphasis added). In other words, deference to the Secretary's interpretation is warranted in cases in which such an interpretation serves to benefit the citizen taxpayer, not the State. This is a statutory mandate.

To the extent that *Aronov* established a rule permitting deference to the Secretary in all circumstances, we disavow any such understanding. We therefore

---

[6] "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. Interestingly, "[t]his principle, of course, distributes the power to make law to the legislature, the power to execute law to the executive, and the power to interpret law to the judiciary." *News & Observer Publ'g Co. v. Easley*, 182 N.C. App. 14, 19–20 (2007); *accord., e.g.*, *In re Ernst & Young, LLP*, 363 N.C. 612, 616 (2009).

[7] This is the version of section 105-264(a) that was in effect during the tax years in which Philip Morris—relying on the Department's interpretation—claimed the relevant deductions. More specifically, that is, 2012 through 2014.

align ourselves with previous precedent repudiating agency deference when the question is one of law. *See, e.g.*, *Brooks v. McWhirter Grading Co.*, 303 N.C. 573, 580–81 (1981) ("When the issue on appeal is whether a state agency erred in interpreting a statutory term, an appellate court may freely substitute its judgment for that of the agency and employ *de novo* review." (citations omitted)).

Nonetheless, even in the absence of such caselaw providing deference, the Department represented its interpretation as controlling. Every year the Department publishes its Tax Law Changes publication, which summarizes the recent legislative changes to the State's Revenue laws. Consistent with this practice, the Department issued the *Supplement to the 2003 Tax Law Changes: Extra Session on Economic Development Incentives* [hereinafter *2003 Supplement*], https://www.ncdor.gov/documents/laws-and-decisions/north-carolina-supplement-2003-tax-law-changes/open. In this publication the Department states:

> This document is designed for use by personnel in the North Carolina Department of Revenue. *It is available to those outside the Department as a resource document*. It gives a brief summary of the following tax law changes:
>
> (1) Changes made by prior General Assemblies that take effect for tax year 2003. Each change enacted by a prior General Assembly is also discussed in the Department's Tax Law Change document for the year the change was enacted.
>
> (2) Changes made by the 2003 General Assembly, regardless of when they take effect.

N.C. Dep't of Revenue, *North Carolina 2003 Tax Law Changes* 1 (2003), https://

www.ncdor.gov/documents/laws-and-decisions/north-carolina-supplement-2003-tax-law-changes/open (emphasis added). Accordingly, this publication is used internally by the Department and externally relied upon as a resource by citizen taxpayers. *Id.*

As early as 1999, the Department included the Export Credit Statute in its website publication *1999 Tax Law Changes-Corporate Income Tax*, https://www.ncdor.gov/taxes-forms/information-tax-professionals/revenue-laws/1999-tax-law-changes/1999-tax-law-changes-corporate-income-tax. Indicated by the web address "information-tax-professionals," the Department recognized that information it disseminates on the website regarding this tax provision was provided for use by "tax professionals" representing taxpayers, bolstering its reliability.

In the *Rules and Bulletins Taxable Years 2003 & 2004*, the Department noted that the "second extra session of the 2003 General Assembly made several changes to [the Export Credit Statute]." N.C. Dep't of Revenue, *Rules and Bulletins Taxable Years 2003 & 2004* [hereinafter *2003 & 2004 Bulletin*], https://www.ncdor.gov/documents/files/corp-rules-and-bulletins-2003-and-2004/open. But because, the changes would not be effective until 2005, the Department declared the Amendment "outside the scope of this publication" and *specifically* directed citizen taxpayers to the Department's website for information regarding these law changes. *Id.*

In the *2003 Supplement* found on the Department's website, the Department summarized several substantive, clarifying, and technical changes made by the 2003 Amendment to the statute. *See 2003 Supplement*, https://www.ncdor.gov/docum

ents/laws-and-decisions/north-carolina-supplement-2003-tax-law-changes/open. The Department neither indicated a change of position nor identified a new limitation on a taxpayer's ability to generate, and thus carry forward credits under N.C.G.S. § 105-130.45.

Inexplicably, the Department even failed to mention that the carryover provision had been extended to ten years; however, the Department did acknowledge other changes. The Department acknowledged that "[s]ubdivision (3) was added to provide a definition for successor in business." *2003 Supplement* at 5. The Department further stated that "[a] successor in business is a corporation that through amalgamation, merger, acquisition, consolidation, or other legal succession becomes invested with the rights and assumes the burdens of the predecessor corporation and continues the cigarette exportation business." *Id.*

The Department also discussed one change to subsection (b) of N.C.G.S. § 105-130.45 that it characterized as "clarifying." According to the Department: "The clarifying change clarifies that the maximum *allowable credit* for cigarettes exported during a tax year is six million dollars, before applying the tax limitations provided for in subsection (c)." *Id.* (emphasis added). Nowhere does the Department use the term "generate." Instead, the Department uses the term, "allowable credit." *Id.* As defined above, "allowable credit" or "credit allowed" is the maximum credit that a taxpayer may *claim. See Virginian Hotel Corp.*, 319 U.S. at 526–27. Therefore, according to the Department's own explanation of the 2003 Amendment, the change

only applied to amounts claimed and not to those generated.

Moreover, "[a] clarifying amendment, unlike an altering amendment, is one that does not change the substance of the law but instead gives further insight into the way in which the legislature intended the law to apply from its original enactment." *Ray v. N.C. Dep't of Transp.*, 366 N.C. 1, 9 (2012). In recognition that the Department has conceded that the original Export Credit Statute, prior to the 2003 Amendment, did not limit credit generation, a clarifying statement does not alter this position.

The Department missed yet another opportunity to notify citizen taxpayers that it changed its position when it published its 2005 & 2006 bulletin.[8] "When the Secretary interprets a law by adopting a rule or publishing a bulletin or directive on the law, the interpretation is a protection to the officers and taxpayers affected by the interpretation, and taxpayers are entitled to rely upon the interpretation." N.C.G.S. § 105-264(a). In this bulletin, there was an entire section dedicated to "limitations and carryforward," which largely parroted the language of the statute. However, significantly, the Department again made no mention that it was changing positions. *See* N.C. Dep't of Revenue, *Rules and Bulletins Taxable Years 2005 & 2006* [hereinafter *2005 & 2006 Bulletin*], https://www.ncdor.gov/documents/files/2005-2006-rulesandbulletins/open.

---

[8] On 11 April 2006, Philip Morris made it clear by letter to the Department of Revenue its intention to claim tax credit carryforwards earned in tax years 1999 through 2004 in excess of six million dollars each year.

The trial court found that "the [foregoing] documents upon which Philip Morris claims to rely are not rules, bulletins, or directives from the Secretary communicating the Secretary's interpretation of the law." We disagree.

*Black's Law Dictionary* defines "bulletin" as "an officially published notice or announcement concerning the *progress of matters* of public importance and interest." *Bulletin*, *Black's Law Dictionary* (6th ed. 1990) (emphasis added).[9] The *1999 Tax Law Changes-Corporate Income Tax*, the *2003 & 2004 Bulletin*, the *2003 Supplement*, and the *2005 & 2006 Bulletin* are undoubtedly officially published announcements concerning matters of public importance. These are precisely the type of documents contemplated by the statute, and those upon which citizen taxpayers can rely. *See* N.C.G.S. § 105-264(a) ("[T]he interpretation [of the Secretary of the Department of Revenue] is a protection to the officers and taxpayers affected by the interpretation, and *taxpayers are entitled to rely upon the interpretation*." (emphasis added)).

For example, the *2003 Supplement* evidenced the "progress of the matter" as the General Assembly revised the statute to clarify the rules for successors in business and extended the carryforward time period. The Department endorsed this document in its *2003 & 2004 Bulletin* by *specifically* directing citizen taxpayers to the Department's official website for "information on these tax changes." *2003 & 2004*

---

[9] We recognize that the most appropriate definition would be found in *Black's Law Dictionary* 8th edition, which was published in 2004; however, *Black's Law Dictionary* suspended its printing of the definition for "Bulletin" in 2004.

*Bulletin* at 76. Therefore, Philip Morris was entitled to rely upon this series of bulletins.

Finally and most troubling, after the subject tax years, the Department published for calendar year 2008 an economic incentives report on the Export Credits as mandated by section 105-130.45(f). *See* N.C.G.S. § 105-130.45(f) (2007). In this report the Department noted that Philip Morris had "generated" Export Credits of twelve million dollars over multiple years. Therein, the Department wrote that Philip Morris' "export volumes . . . resulted in the generation of credits above the $6 million cap. *These excess credits are available to be taken in future years.*" N.C. Dep't of Revenue, *Cigarette Export Credits*, Processed During Calendar Year 2008 (2009) (emphasis added). Even after the Department had taken one position regarding the 2006 and 2007 returns, it took the opposite position in 2008 without any explanation for doing so.

Simply put, the Department's actions amount to an abrupt reversal of policy without notice to the public or taxpayers. The actions here lacked transparency and are plainly contrary to the trust the public deserves from its government. This conduct is unacceptable. As mandated by statute and recognized by the Department in its own publications, citizen taxpayers must be able to rely on the representations of the Department. Businesses need consistency and clarity to operate efficiently. *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2272 (2024) (stating "unwarranted instability in the law[ ] leav[es] those attempting to plan around

agency action in an eternal fog of uncertainty"); *see also e.g., Bulova Watch Co. v. Brand Distribs. of N. Wilkesboro, Inc.*, 285 N.C. 467, 472 (1974) (explaining "stability in the law and uniformity in its application . . . enable people to predict with reasonable accuracy the consequences of their acts and business transactions").

The Department should consistently, plainly, and publicly interpret and apply revenue statutes and regulations for all taxpaying citizens. This is a statutory mandate.

## Conclusion

The fulcrum of this case is the meaning of "credit allowed" contained in subsections (b) and (c) of the Export Credit Statute. A close reading of the statute reveals an inconsistent use of the term which creates an ambiguity.

In examining subsection (c), we appropriately consider the term's technical use and understanding. That technical use and understanding compel us to adopt an interpretation of "credit allowed" in subsection (c) consistent with its common use in the accounting industry. Accordingly, we define "credit allowed" as contained in subsection (c) as the amount of credit which may be *claimed* each tax year.

At the same time to bring clarity and logical meaning to the statute, in subsection (b) we examine the context of the statute and employ the "whole text" canon to find that the plain meaning of "credit allowed" is most appropriate. We, therefore, reconcile any ambiguity by adopting the term's plain meaning in that context. The plain meaning of "credit allowed" contained in subsection (b) is the

amount of credit which may be *generated* each tax year.

Even further, it is undisputed that the Department interpreted the original version of the Export Credit Statute as permitting unlimited credits calculated based on cigarette exports, which could then be carried forward. In fact, as found by the trial court, the Department conceded that Philip Morris' current interpretation of "credit allowed" is consistent with the Department's prior interpretation of N.C.G.S. § 105-130.45 before the 2003 Amendment.

The Department now argues that the 2003 Amendment revised the statute to limit export credits generated to six million dollars each year. We disagree. The legislature—as demonstrated by the language in the Amendment—made clear that the Amendment is designed to prevent "double dipping" by a surviving corporation and a merged corporation, thus prohibiting both from taking advantage of the same credit and carryforward on their separate income tax returns. The only change to the carryforward provision is the extension of the carryforward period from five to ten years.

Moreover, the Department's representations and actions do not support its current position. Despite acknowledging the ability to "generate" credits "above the $6 million cap" in its 2008 economic incentives report mandated by subsection (f) of the Export Credit Statute, the Department now argues that the 2003 Amendment always created a limit on export credits "generated." Yet the Department has repeatedly failed to act in accordance with this interpretation or even announce its

change in position. As mandated by N.C.G.S. § 105-264(a) and recognized by this Court, Philip Morris is entitled to rely on these representations and actions.

Accordingly, we reverse the trial court's order of summary judgment in favor of the Department and remand this matter to the trial court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice RIGGS dissenting.

The question presented by this case is whether the North Carolina statute that provides a tax credit to corporations manufacturing cigarettes for exportation, N.C.G.S. § 105-130.45, limits the credit that a taxpayer can generate in a given tax year. The plain language of the amended version of the statute unambiguously says the amount of credit a taxpayer can generate in a given year under N.C.G.S. § 105-130.45(b) "may not exceed six million dollars." N.C.G.S. § 105-130.45(b) (2003).[1] While I agree with the majority that the phrase "credit allowed" has different meanings in different subsections of N.C.G.S. § 105-130.45, reading the statute in context, I do not agree that the different meanings create ambiguity in the statute. Subsection (b) provided a taxpayer the formula for calculating the credit that the taxpayer can generate within a given year. Reading the entire subsection in context, the phrase limiting the "credit allowed" to six million dollars should apply equally to corporations and successors in business. *See King v. Burwell*, 576 U.S. 473, 486 (2015) ("[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language

---

[1] Section 105-130.45 was amended by Session Law 2003-435 and was effective for cigarettes exported on or after 1 January 2005. *See* Act of Dec 16, 2003, S.L. 2003-435, § 5.2, 2003 N.C. Sess. Laws 1421, 1431–32. The modified language was first codified in the 2004 interim supplement but was left out of the General Statutes until 2009. *Compare* N.C.G.S. § 105-130.45 (Supp. 2004), *with* N.C.G.S. § 105-130.45 (2005). The language in the session law, however, is controlling. *See Wright v. Fid. & Cas. Co. of N.Y.*, 270 N.C. 577, 587 (1967) (noting that Session Laws are controlling over the codified version of the General Statutes).

is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." (cleaned up)). Therefore, I would affirm the decision of the Business Court and respectfully dissent.

## I.    Analysis

In 1999, the General Assembly adopted economic development legislation to provide export tax credits to manufacturers of cigarettes exported for sale outside of the United States. Under the original version of N.C.G.S. § 105-130.45, subsection (b) allowed a taxpayer to generate or accrue an unlimited amount of export tax credit based on its volume of cigarettes exported, while subsection (c) limited the amount of credit a taxpayer could claim per year to six million dollars. Neither party disputes that the original 1999 version of N.C.G.S. § 105-130.45 was unambiguous.

In 2003, the General Assembly modified the language in N.C.G.S. § 105-130.45(b), the subsection that provides the formula for calculating the tax credit for corporations engaged in the business of manufacturing cigarettes within the state for foreign exportation. The section was modified by the addition of the language in italics below:

> (b) Credit. — A corporation engaged in the business of manufacturing cigarettes for exportation to a foreign country *and that waterborne exports cigarettes and other tobacco products through the North Carolina State Ports during the taxable year* is allowed a credit against the taxes levied by this Part. The amount of credit allowed under this section is determined by comparing the exportation volume of the corporation in the year for which the credit is claimed with the corporation's base year exportation volume, rounded to the nearest whole percentage. *In the*

*case of a successor in business, the amount of credit allowed under this section is determined by comparing the exportation volume of the corporation in the year for which the credit is claimed with all of the corporation's predecessor corporations combined base year exportation volume, rounded to the nearest whole percentage.* The amount of credit allowed *may not exceed six million dollars ($6,000,000) and* is *computed* as follows:

. . . .

(c) Cap. — The credit allowed under this section may not exceed the lesser of six million dollars ($6,000,000) or fifty percent (50%) of the amount of tax imposed by this Part for the taxable year reduced by the sum of all other credits allowable, except tax payments made by or on behalf of the taxpayer. This limitation applies to the cumulative amount of the credit allowed in any tax year, including carryforwards claimed by the taxpayer under this section for previous tax years. Any unused portion of a credit allowed in this section may be carried forward for the next succeeding *ten* years.

An Act to Make the Following Changes Recommended by the Governor: . . . Extend the Sunset On and Modify the Cigarette Exportation Tax Credit and Modify the Base Year, [and] Create an Enhanced Tax Credit for Cigarette Exportation . . . . , S.L. 2003-435 § 5.2, 2003 N.C. Sess. Laws (2d Extra Sess. 2003) 1421, 1431–32. Although not included in the excerpt above, subsection (b) of N.C.G.S. § 105-130.45 concludes with a calculation table incorporating the computation specifications for calculating the tax credit based upon export volume.

## A. N.C.G.S. § 105-130.45 Is Not Ambiguous

The majority begins its analysis by concluding that N.C.G.S. § 105-130.45 is ambiguous because the phrase "credit allowed" has different meanings in subsections

(b) and (c) of the statute. However, the fact that the phrase "credit allowed" has different meanings in subsection (b) and subsection (c) does not per se create ambiguity in the statute. When we apply the majority's definition of "credit allowed" to the plain language of subsection (b)—in its entirety—the amended statute applies a six million dollar annual limit to the generation of export tax credits for both corporations and successors in business alike.

This Court begins every question of statutory interpretation with a presumption that the words used in the statute unambiguously represent the will of the legislature. *See N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009) ("Because the actual words of the legislature are the clearest manifestation of its intent, we give every word of the statute effect, presuming that the legislature carefully chose each word used."). Whether statutory language is ambiguous does not turn solely on dictionary definitions of its component words but also on "the specific context in which that language is used, and the broader context of the statute as a whole." *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). The Court "does not read segments of a statute in isolation"; rather, we construe statutes to "giv[e] effect, if possible, to every provision." *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 188 (2004). It is well established that "[w]hen the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute,

and judicial construction of legislative intent is not required." *Diaz v. Div. of Soc. Servs.*, 360 N.C. 384, 387 (2006).

Generally, there is a "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). But that presumption does not always hold, and the fact that a legislative body may choose to give identical words different meanings in different sections of a statute does not, by definition, mean that the statute is ambiguous. *See id.* (recognizing that the presumption that words in the same statute have the same meaning "readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent"). Words have different shades of meaning and may be construed differently even when used in the same statute. *Id.* The Supreme Court of the United States has repeatedly "affirmed that identical language may convey varying content" even when used "in different provisions of the same statute." *Yates*, 574 U.S. at 537 (plurality opinion); *see also, e.g.*, *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 313–14 (2006) ("located" has different meanings in different provisions of the National Bank Act); *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 594–98 (2004) ("age" has different meanings in different provisions of the Age Discrimination in Employment Act of 1967); *Robinson*, 519 U.S. at 342–44 ("employee" has different meanings in different sections of Title VII of the Civil Rights Act of 1964); *United*

*States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) ("wages paid" has different meanings in different provisions of 26 U.S.C.); *Atl. Cleaners*, 286 U.S. at 433–37 ("trade or commerce" has different meanings in different sections of the Sherman Act). For this reason, I do not find it reasonable to conclude the statute is ambiguous simply because credit allowed is used differently in different subsections.

Statutory interpretation is determined "not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole." *Yates*, 574 U.S. at 537 (plurality opinion) (cleaned up); *see also Vogel v. Reed Supply Co.*, 277 N.C. 119, 131 (1970) ("Words and phrases of a statute must be construed as a part of the composite whole and accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit." (cleaned up)). In N.C.G.S. § 105-130.45, the titles of the different subsections provide context for the different uses of the phrase "credit allowed" and aid our interpretation of the statute. The majority, in a footnote, says "while the title of subsection (c) "Cap" serves to clarify that subsection (c) imposes a limit on the export credit's use, the title of subsection (b) "Credit" is not sufficiently specific to add clarity." I find this reasoning circular: the majority jumps to assume ambiguity in a statute to which it objects and then disclaims that a subsection title cannot save the statute from ambiguity. But if you start from a presumption of non-ambiguity, the subsection titles provide corroborating evidence and are not required to do much work to save the statute.

Indeed, when these titles are viewed in the context of the purpose of the statute—to provide a tax credit for cigarette manufacturing for export—it is obvious that one of the subsections in N.C.G.S. § 105-130.45 must tell the taxpayer how to calculate the credit. That is exactly the purpose of subsection (b): to give the taxpayer the formula to calculate how much credit it has generated in a given year. *See King*, 576 U.S. at 486 ("[W]hen deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))). This interpretation is further reinforced by the language in the final sentence of subsection (b) leading into the calculation table: "The amount of credit allowed may not exceed six million dollars ($6,000,000) and is computed as follows:".

The majority concludes that the first phrase of that final sentence—the amount of credit allowed may not exceed six million dollars—only applies to successors in business. But that interpretation does not work for two reasons: First, it runs contrary to the principle that portions of a subsection should not be read in a vacuum. *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (recognizing "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (internal citation omitted)). Second, adhering to the majority's interpretation would produce an absurd result. *See State ex rel. Comm'r of Ins. v. N.C. Auto. Rate Admin. Off.*, 294 N.C. 60, 68 (1978) ("In construing statutes courts normally adopt an interpretation which will avoid absurd or bizarre

consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results."). Following the majority's interpretation to its logical conclusion would result in a statute that only provides a tax credit for successors in business.

To the first point, subsection (b) must be interpreted in the context of the entire subsection. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) (acknowledging that with statutory construction the "choice of words is presumed to be deliberate, so too are [statute's] structural choices"). Subsection (b) is composed of four sentences. The first sentence states the conditions that a corporation must meet to qualify for this credit. *See* N.C.G.S. § 105-130.45(b). The balance of the subsection explains how taxpayers determine the credit. The second sentence begins with the phrase "The amount of credit allowed under this section is determined by," and goes on to explain that a corporation determines the applicable credit by comparing exportation volume in the year the credit is claimed with a base year exportation volume. *See id.* The next sentence of the subsection clarifies that a successor in business determines its tax credit using export volumes of the "corporation's predecessor corporations' combined base year exportation volume." *See id.* The final sentence of the subsection begins with "[t]he amount of credit allowed may not exceed six million dollars" and then provides the computational details. *See id.* This sentence does not contain any limiting clause to indicate that it only applies to a "successor in business." The contrast between the last two sentences makes clear

that if the General Assembly wanted to limit the amount of credit calculated based upon the formula that follows, it knew how to add a limiting clause. However, the General Assembly did not include limiting language to restrict the application of the final sentence to just successors in business.

The majority's interpretation produces an absurd result: A scenario in which the tax credit statute only provides a computational framework for a successor in business, not the original corporation, to calculate a tax credit. Using the majority's logic, if the phrase "[t]he amount of credit allowed may not exceed six million dollars ($6,000,000)" only applies to a successor in business, then the second clause of that same sentence also only applies to a successor in business because "credit allowed" is the subject for both clauses of the sentence. Therefore, credit allowed must mean the same thing when applied to each clause in the sentence. If credit allowed in that final sentence only applies to successors in business, then the computation details also only apply to a successor in business and corporations like Philip Morris are left without a means of calculating a tax credit. Because principles of statutory interpretation require avoidance of an absurd result, the final sentence in subsection (b) must limit the amount of tax credit generated per year to six million dollars for both corporations and successors in business.

The majority also argues that the doctrine of the last antecedent bolsters its interpretation that the six million dollar limit only applies to a successor in business. However, the majority misapplies the doctrine. The majority quotes the doctrine of

the last antecedent from *Wilkie v. City of Boiling Spring Lakes* but omits the final phrase of the doctrine that explains the doctrine applies "unless the context indicates a contrary intent." 370 N.C. 540, 548–49 (2018) (quoting *HCA Crossroads Residential Ctrs., Inc. v. N.C. Dep't of Hum. Res.*, 327 N.C. 573, 578 (1990)). In full, the doctrine says that "relative and qualifying words, phrases, and clauses ordinarily are to be applied to the word or phrase immediately preceding rather than extending to or including others more remote, unless the context indicates a contrary intent." *Id.* (cleaned up). Put simply, "a limiting clause or phrase . . . ordinarily . . . modifi[es] only the noun or phrase that it immediately follows." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). The phrase at issue, here, "The amount of credit allowed may not exceed six million dollars," is not a relative or qualifying phrase in the sentence discussing how the credit allowed is determined for a successor in business. Rather, it is an independent clause in a different sentence that explains the methodology for calculating the credit. Furthermore, "successor in business" is not the noun or phrase immediately preceding "credit allowed." The statute's context plainly indicates that "credit allowed" does not modify "successor in business." The doctrine of the last antecedent does not apply in this scenario.

## B. The Department's Interpretation of the Statute

The majority concludes that because the Department allowed taxpayers to generate an unlimited amount of tax credit before the statute was amended and the

Department did not identify the change in the statute as a substantive change in its 2003 Tax Supplement, the Department should be precluded from enforcing the six million dollar generation limit in the amended statute. But by that logic, the majority's argument would allow an administrative agency to invalidate legislative action simply by not identifying the legislative action as substantive. That cannot be the case.

The majority begins its discussion of Philip Morris' reliance on the Department's interpretation of N.C.G.S. § 105-130.45 by stating that the Court should not defer to the Department's interpretation in all circumstances. I agree generally, but I think this then creates some trouble for the majority's cause. The statute that gives the Secretary of the Department of Revenue the duty to interpret laws administered by the Department, N.C.G.S. § 105-264(a), explicitly states that "[t]he Secretary's interpretation of these laws shall be consistent with the applicable rules." This Court has further recognized that in reviewing a taxpayer's challenge to an exemption from tax, the Court is mindful that tax credits, a type of exemption from taxation, "are privileges, not rights, and are allowed as a matter of legislative grace." *Aronov v. Sec'y of Revenue*, 323 N.C. 132, 140 (1988) (cleaned up). "A statute providing exemption from taxation is strictly construed against the taxpayer and in favor of the State." *Id.*

It then becomes significant that this Court is asked to construe an amended statute. In construing a statute with reference to an amendment, "it is logical to

conclude that an amendment to an unambiguous statute indicates the intent to change the law." *Childers v. Parker's, Inc.*, 274 N.C. 256, 260 (1968). The majority attached significance to the fact that prior to the amendment, the Department did not interpret N.C.G.S. § 105-130.45 to limit the amount of "credit generated." But before the amendment, the statute did not contain language limiting the amount of credit a taxpayer could generate—that language was added as part of the amendment. This Court assumes that the legislature understands the law, understands that a taxpayer could generate an unlimited tax credit before N.C.G.S. § 105-130.45 was modified, and intentionally made the change.

After the statute was amended, the Department identified the change in the *Supplement to 2003 Tax Law Changes*. To be sure, the Department characterized the change as a clarifying change. The supplement stated the change "clarifies that the maximum allowable credit for cigarettes exported during a tax year is six million dollars, before applying the tax limitations provided for in subsection (c)." Thus, while it is understandable that Philip Morris may consider this change to be more substantive than clarifying, the Department does not, by supplement publication, get to change the nature of the amendment to the statute. The Department's definition of the change as clarifying instead of substantive in the Supplement is not dispositive because the Department's interpretation of the nature of the amendment is not dispositive. *See Aronov*, 323 N.C. at 140 ("In all tax cases, the construction placed upon the statute by the Secretary . . . of Revenue, although not binding, will be given

due consideration by a reviewing court."). This Court, and the majority, have recognized that a clarifying amendment "gives further insight into the way in which the legislature intended the law to apply from its original enactment." *Ray v. N.C. Dep't of Transp.*, 366 N.C. 1, 9 (2012). The legislature seemingly realized the original statute allowed taxpayers to generate and carry forward an unlimited amount of tax credit and wanted to place limits on the maximum tax credit a taxpayer could generate under this statute, similar to the limits placed on the maximum generation of tax credits found in N.C.G.S. § 105-130.46, captioned "Credit for manufacturing cigarettes for exportation while increasing employment and utilizing State Ports." N.C.G.S. § 105-130.46(d) (2005) ("The amount of credit earned during the taxable year may not exceed ten million dollars ($10,000,000)."). The legislature has that authority. I doubt the Court would allow the legislature's authority to amend criminal statutes to be undermined by a similar concern of notice to taxpayers.

In concluding that the *Supplement to 2003 Tax Law Changes* would not put a taxpayer on notice that the change limited the amount of credit a taxpayer could generate in a given year, the majority contradicts its own interpretation of the statute. The *Supplement to 2003 Tax Law Changes* identified that the modifications to subsection (b) "clarifie[d] that the maximum allowable credit for cigarettes exported during a tax year is six million dollars, before applying the tax limitations

provided for in subsection (c)."[2] The majority interpreted this explanatory language to "appl[y] to the amounts claimed and not to those generated." But the majority already said that "the plain and logical meaning of 'credit allowed' in subsection (b) is 'generate.'" If subsection (b) addresses how much credit a taxpayer can generate, then a modification to that subsection is a modification to the amount of credit a taxpayer can generate.

Finally, I am troubled by the scolding tone with which the majority addresses the Department. The majority does not purport to overrule *North Carolina Acupuncture Licensing Board v. North Carolina Board of Physical Therapy Examiners* or the long line of cases cited in that decision, so it is still the law of the land that this Court "gives great weight to an agency's interpretation of a statute it is charged with administering" even though the "agency's interpretation is not binding." 371 N.C. 697, 700 (2018) (cleaned up). It is also still true that the Supreme Court "will not follow an administrative interpretation in direct conflict with the clear intent and purpose of the act under consideration." *Id.* at 701 (cleaned up). Here, it seems plain to me that regardless of the Department's prior interpretations, the Department's current interpretation is consistent with the clear intent and purpose of the law at issue here. I do not see any grounds for inferring bad intent or actions on the part of the Department for honoring the intent of the legislature. It may be

---

[2] Subsection (c), captioned as "Cap," limits the "cumulative amount of the credit allowed in any tax year, including carryforwards claimed by the taxpayer under this section for previous tax years." N.C.G.S. 105-130.45(c).

that this Court intends to follow the federal trend and more fully reject agency deference as the Supreme Court of the United States did in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). But this larger, politically-charged issue does not relate to situations in which an agency is acting in accord with the legislature regarding what I believe to be a non-ambiguous statute. In my view, the General Assembly clearly amended N.C.G.S. § 105-130.45(b) to add a limit to the credit a taxpayer could generate under the amended statute. The Department identified the change to the taxpayer. The Department's identification of the change as a clarifying change, not a substantive change, does not give this Court an avenue to write the change out of the statute. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable.").

## II.    Conclusion

In sum, I would hold that the amended version of N.C.G.S. § 105-130.45 creates a limit on the amount of tax credit that a corporation or successor in business can generate in a given tax year and thus would affirm the decision of the Business Court.

Justice EARLS joins in this dissenting opinion.